**CLAUDE NEON LIGHTS, Inc., v. E. MACHLETT & SON.**

Circuit Court of Appeals, Second Circuit.
July 2, 1928.

Nos. 328, 329.

1. Patents ⊚══66(4)—Patent is not "prior art," as respects subsequent patent issued to same person (35 USCA § 31).

A patent previously granted is not prior art, as respects subsequent patent issued to same person, since Rev. St. § 4886 (35 USCA § 31; Comp. St. § 9430), makes only knowledge or use by others a bar.

2. Patents ⊚══26(2)—Combination patent, bringing about new and useful result, commercially successful and of substantial value, will be protected.

Combination patent, which brings about a new and useful result, which is commercially new and has substantial value, as shown by its reception in the trade, is valid and will be protected.

3. Patents ⊚══328—1,191,495, for method of separating neon from gases with which mixed, held invalid.

Claude patent, No. 1,191,495, for a method of separating neon from gases with which it is mixed, *held* invalid, as attempt to secure monopoly of process of what inherently happened in normal and intended operation of prior patent.

4. Patents ⊚══328—1,125,476, for system of illumination by luminous tubes, held valid and infringed as to claim 1.

Claude patent, No. 1,125,476, for system of illuminating by luminous tubes *held* valid and infringed as to claim 1.

Appeal from the District Court of the United States for the Eastern District of New York.

Patent infringement suits by Claude Neon Lights, Inc., against E. Machlett & Son. Decree for defendant (21 F.[2d] 846), and plaintiff appeals. Modified.

Bohleber & Ledbetter, of New York City (Edwin J. Prindle, Thomas Ewing, and William Bohleber, all of New York City, of counsel), for appellant.

Darby & Darby, of New York City (Edwin L. Garvin and Samuel E. Darby, Jr., both of New York City, of counsel), for appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge. The appellant sues on patent No. 1,125,476, application filed November 9, 1911, and granted January 19, 1915, and patent No. 1,191,495, application filed June 17, 1913, and granted July 18, 1916, which relate to neon gaseous conductor tubes and a method of separating neon from gases with which it is mixed. The appellant is the assignee of both patents, and seeks injunctive relief, as well as an accounting of profits and damages.

In his first patent, the patentee refers to an earlier French patent, filed in his name March 7, 1910, which relates to lighting by luminescence of the rare gases of the atmosphere, especially of neon, and says that it has been pointed out that the property of these gases is very largely attenuated by the appearance of traces of other gases, particularly of nitrogen, and that as a consequence it is necessary to employ an exceedingly efficacious purification process on the spot, in order to attain a high degree of purity of neon, which fills the tubes of his present patent, notwithstanding the liberation of gases occluded in the walls or in the electrodes during the formation of the said tubes.

There are two claims sued on in the first patent. ·Claim 1 reads as follows:

· "1. A luminescent tube containing previously purified neon, and provided with internal electrodes for illuminating said gas, said electrodes being deprived of occluded gases and having an area exceeding 1.5 square° decimeters per ampere, to decrease the vaporization of the electrodes and prevent the consequent formation upon the walls of the tube, in proximity to said electrodes, of deposits containing said gas, whereby the luminosity of the tube is maintained constant for a very considerable period of time without a fresh introduction of gas."

Claim 2 differs from claim 1 only in the additional provision with reference to the electrodes "being supported without direct contact with the walls of the tube."

In patent No. 1,191,495, claim 2, sued on, reads as follows:

"2. The method of obtaining neon purified from nitrogen, oxygen, helium, etc., in a closed receptacle containing electrodes having a surface large enough to practically avoid absorption of neon during operation, which comprises establishing within the receptacle a highly rarefied atmosphere containing neon, and passing an electric discharge between the electrodes, said discharge being continued until the impurities have been removed from the neon to such an extent that they will be practically invisible in the spectrum obtainable from the residual gas."

Gases are classed as active and inactive. The former are the more common ones, such as oxygen, hydrogen, nitrogen, carbon monoxide, and carbon dioxide, while the latter are neon, helium, argon, krypton, and xenon.

We ·will, at the outset, state our understanding of what patent No. 1,125,476 describes and teaches. In short phrase, the system of illuminating by luminous tubes is directed to a source of illumination by means of a gas-discharged tube. An efficacious process employed "on the spot," in order to obtain a high degree of purity, is deemed necessary, because of the liberation of the gases occluded in the walls or in the electrodes during the formation of the tubes. An old and known tube, the Geissler, or a known and ordinary spectrum, is used. It consists of a glass vessel comprising two enlarged ends, in the ends of which electrodes are inclosed. The enlarged ends are connected by a capillary portion of smaller diameter. The tubes with receptacle are filled with wood or cocoanut charcoal, which, at the temperature

of the liquid air, "will absorb the impurities of the rare gases employed or the air introduced, owing ·to defective manipulation, or the occluded gases in proportion as they are liberated." The preferred operation "consists in alternating during the passage of the current exhaustion by means of the vacuum pump $c$ and the admissions of neon at $d$ until the tubes have been appropriately scavenged." The tube is pumped, a discharge between the electrodes is secured by passing a current, and charges of gas are admitted into the tubes, and the operation repeated or continued to scavenge the tube, until the last detrimental traces of foreign gases are absorbed. Thereupon the tube acquires its full brilliancy and retains it indefinitely, after which the liquid air and charcoal pump is sealed off and the tube is ready. Until the electrodes cease to give off gas, it is necessary to employ currents for the discharge, which are greater than the normal operating current, for otherwise, no matter what period of time was occupied in the formation, the electrodes must yield gas in service, and the tube will lose a large portion of its brilliancy temporarily. To deprive the electrodes of their occluded gases, it is necessary to employ an abnormally heavy current. The electrodes are deprived of their occluded gases by heating. To prevent the electrodes thus heated from coming in contact with the glass wall of the tube, and thereby cracking it, the patent suggests the separation from the glass by means of two collars of glass beads. Referring to electrodes, the patentee says:

"Now, in these conditions, with iron or copper electrodes, for example, the neon disappears somewhat rapidly, the resistance of the tube increases, and after some score hours it becomes extinguished. Simultaneously the electrodes undergo rapid vaporization, and it has been found that the deposit formed upon the walls of the tube in proximity to the electrodes contains a large quantity of neon, a fact which is very curious, and quite contrary to what might have been expected." .

After referring to the cause of the disappearance of the neon, the patentee says:

"Attention having thus been fixed to this point, it has been ascertained that this combination (between the neon gas and the deposited film) is a function of the rapidity of the vaporization; if the surface of the electrode is sufficiently large for the heating to be small, the vaporization is smaller, and the disappearance of the neon is very slow, and a very long life of the tube may be obtained by this method. This fact is very remarkable

indeed, and constitutes a highly useful and unexpected discovery; the conditions thus realized constituting in effect the only case known where a discharge tube of any kind can actually operate practically indefinitely without renewal of the gas."

It has been found that this necessary electrode area is at least 1.5 square decimeters per ampere. Thus, says the patentee, by making the electrodes with an area at least 1.5 square decimeters per ampere, it will reduce heating to such an extent that "a single charge of neon is sufficient to insure to the tube a very long life, compared with that of an incandescent." Thus there is specified as the critical surface area of electrodes at least 1.5 square decimeters per ampere. Greater volume of gas secures a greater life of the tube because it requires a longer time to absorb, and the patentee specifies the use of neon at a pressure of "the nature of a millimeter of mercury," which is said to be 10 times more than Moore used in his tubes. The tubes are used until they are used up and replaced by others. The invention has the elements of (a) previously purified neon; (b) electrodes deprived of their occluded gases; (c) electrodes having a surface area in excess of the critical area of 1.5 square decimeters per ampere to prevent vaporization. The learned court below held the patent valid, but not infringed by the specific Chevrolet signs.

A sharply contested argument is presented as to what constitutes previously purified neon. According to the patent, it is not limited to neon purified by any particular process. The appellant's expert defines it as meaning neon gas which is in the tube, and, when operating in the regular way commercially, has been purified previous to its regular use. And this is borne out by the instruction of the patent that the purifying process is continued until the last detrimental traces of foreign gases are absorbed, and the tube, not only acquires its full brilliancy, but retains it indefinitely. The use of the word "detrimental" indicates that there are traces of foreign gases which do not impair the brilliancy of the neon color and need not be removed, and so "detrimental" traces which do interfere with the color and brilliancy should be removed. The patent discloses two alternative methods of purifying, or providing the tubes with "previously purified neon"; the first "the charcoal liquid air method," the most effective because it required only "approximately pure gas," whereas, the second, the "method of separate scavengings with an especially prepared and absolutely

pure gas," required absolutely pure neon. The scavenging method required a much larger quantity of neon than the carbon liquid air process. The finished product is the same, whichever process is employed. In view of this teaching of the patent, the inventor cannot be held to have intended to restrict the neon to that which had been purified by a particular method. The claims do not specify a particular method of purification.

It is argued that, to follow the teaching of the patent, it is necessary to show that the neon was purified and the electrodes deprived of their occluded gases during the manufacture of the tube. But we think that the claims referred to neon after it has been purified in the tube and the tube is ready for use. The neon becomes, as referred to, previously purified, no matter what process has been used. Moreover, assuming that the appellee in its commercial use (but not in the infringing signs) did use a percentage of helium, it nevertheless appears that neon containing 15 per cent. helium is sold as commercially pure neon, and that such neon has a degree of purity in the sense in which the term "pure" is applied for the purpose of the patent in suit, because such a mixture would show the characteristic color of neon.

A former employee of the appellee, who said he had to do with the manufacture of the infringing signs, testified that the neon in the tubes was impure, and did not have at first the characteristic neon color, and that, after running a current through the tubes for four or five hours in the shop, the neon assumed the characteristic neon color, indicating that the neon passed from an impure to a pure condition. The appellee's engineer, Machlett, demonstrated the process by which these tubes were made, stating that the process had not been changed from the time the tubes were made, and that he had used twice the normal current, and the neon remained purified, so that the tube, when completed, was commercially useful. He said, if the tube remained in operation, it would reach a point where the impurities would not be discernable with a hand spectroscope, and it was testified that these infringing signs were spectroscopically pure. Their structure and color showed that they contained neon, which had been previously purified. The finished product is identically the same, whether the methods referred to in this patent or the aging process are used in their manufacture. Every prior electrically discharged tube is not purified by aging.

The prior art spectral tubes tested in this

suit were those at the Bureau of Standards, and they were impure. It was not established that any prior art tube would inevitably purify itself by aging. The tubes of the prior art were only run through seconds, or at short intervals, of time, and did not run continuously, and to interpret previously purified neon as including neon purified by aging does not deprive the public of any rights to use the prior art tubes which it possessed when this invention was made. For such use, tubes were used, but they did not purify. The public can continue to use the tubes of the prior art without the charge of infringement. Nobody, before this inventor, purified a spectral tube, at least one used for lighting purposes after the final charge of gas had been introduced into the tube.

The electrodes used by the appellee have an area in excess of 1.5 square decimeters per ampere. It was found that the current density was from 13 to 14 square decimeters per ampere. The court below held that the appellant had not proved that the electrodes were being deprived of their occluded gases, because witnesses testified that other electrodes which had been deprived of occluded gases meant electrodes which had been heated from 900° to 1000°, and the appellee claimed that its electrodes had not been heated over 200° C. The witness, in testifying that the electrodes were heated to 900°, referred to copper electrodes; while the appellee's tubes, upon which infringement is based, have carbon electrodes and alternative material mentioned in the patent in suit. The witness testified that, by heating carbon electrodes only 200° C, it was enough to deprive the electrodes of their occluded gases, and that no more came out and masked the spectrum of the neon. The appellee's engineer testified that it was very essential to degassify and clean the metal of the electrode, referring to the internal electrode, and he pointed out clearly the detrimental effect resulting from the failure to degassify and clean the metal of the electrodes, which would deprive the electrodes of their occluded gases; the detrimental effect being that the light in the tube is likely to change in color, due to the fact that the electrodes have not been sufficiently deprived of their occluded gases.

The chief expedient in the first patent in suit for depriving the electrodes of their occluded gases is to use a heavier current than the normal current during the process. Appellee's engineer went through a complete operation of producing a commercial tube employing carbon electrodes with magnesium carbonate in them. He kept the temperature at 200° C. He had personal charge of the supervision of the manufacture of vacuum tubes for appellee. He described the standard process of preparing the internal electrode type of tubes, having magnesium carbonate filled electrodes for appellee. The infringing signs had carbon electrodes containing magnesium carbonate, according to the answers to interrogatories filed.

The tube of the infringing sign measured approximately 12 millimeters in diameter, and both tubes were approximately the same size tubing. The inspection made of the infringing sign in the possession of the Chevrolet Company found the current flowing through the tubes to be 21½ milliamperes. In the demonstration of the manufacture of magnesium carbonate tubes at the appellee's factory, the engineer used 43 milliamperes. This indicates that, in making these tubes, they increased the current through the electrodes to 200 per cent. of the normal current, and also that the appellee was using the exact expedient directed in the patent in suit for depriving the electrodes of their occluded gases. Indeed, in the Machlett patent, No. 1,618,767, referring to the manufacture of neon tubes, it is said to be the practice to subject the tubes to currents which, during the exhausting operation, are of considerably greater magnitude than are employed under working conditions. Demonstrations made by Machlett, the engineer, at the appellee's factory, obtained a substantially pure commercial neon tube with carbon electrodes that actually contained magnesium carbonate, which demonstration involved the necessity of depriving the electrodes of occluded gases, and it is clear that in the infringing signs, whose electrodes contained no magnesium carbonate, electrodes were deprived of their occluded gases. Carbon gives up its occluded gases at a lower temperature than copper, because of the porosity of the metal. The melting point or the fusing point of any particular metal or substance has nothing to do with the giving up of occluded gases.

There is no testimony that the infringing signs were sent out impure, nor has it been claimed that these signs did not show pure neon color when delivered to the Chevrolet Company. It is established that these signs —Exhibits 9 and 11—have had electrodes deprived of their occluded gases within the meaning of the patent. Therefore it is established that Exhibits 9 and 11 are infringements of claim 1 of the patent sued on, because the appellee has used a luminous tube with previously purified neon and provided with internal electrodes for illuminating the

gas, the electrodes being deprived of their occluded gases and having an area exceeding 1.5 square decimeters per ampere, to decrease the vaporization of the electrodes and prevent the consequent formation upon the walls of the tube in proximity to the said electrodes of deposits containing said gas, whereby the luminosity of the tube is maintained constant for a very considerable period of time without a fresh introduction of gas.

Much testimony has been offered as to prior uses, and literature has been introduced in the attack made upon the validity of this patent. This invention does not reside in the physical properties of the neon gas, the discovery of which was old, but is the appreciation of the advantages of these properties in the selection and adaptation of a gas to practical and commercial systems of illumination in which certain difficulties were overcome. The elements of the combination of the patent are used to produce commercially a long-life tube, as distinguished from an impure tube of short life, and the product claims of the patent in suit may be considered apart from the method of perfection of the neon in the tube and a particular temperature of the electrodes to deprive them of occluded gases, referred to in the second patent. The combination produced a new result, not obtained in any prior art device. The claims in suit are in no way limited to one method of purification.

It is pointed out in the patent that, if the electrodes are too small, there is considerable drop in the potential or voltage at the electrodes, and the large electrode drop is responsible for the repeated disappearance of the gas, due to the high rate of vaporization, or what is referred to as sputtering of the electrodes. The patent points out that, if the electrode drop was kept small enough, the neon gas would be used up very slowly, and the life of the tube would be increased. Tests were made to determine whether the electrode drop and potential increased rapidly when the electrode area was reduced to 1.5 square decimetres per ampere, and it was found that if the number of square decimetres per ampere is increased slightly above the minimum value of 1.5 specified in the inventor's rule of relationship—there is a slowing down of the degrees in the potential drop. This means that it is a distinct advantage, with respect to a long-life tube, to carry the electrode area above 1.5 square decimetres per ampere, because, in this minimum value and below, electrode potential drop is increased enormously: Above the minimum value, however, the electrode potential drop

is low, and decreased only slowly as the number of square decimetres per ampere increase, and therefore advantages are obtained at values anywhere in excess of 1.5 square decimetres per ampere. Therefore 1.5 square decimetres per ampere is regarded as the critical area.

The argument that the button-cæsium or cæsium-mirror electrode proved that the patentee's rules of relationship of surface area to current used plays no part in the life of the tube, is also unsound. Machlett's testimony is a refutation of this claim. The cæsium plays a part which is equivalent to additional surface area of the electrodes. It is equivalent to additional electrodes. The button electrode is always and only used with cæsium. Without the cæsium the button electrode would destroy itself before complete formation of the neon tube. Machlett admits that the cæsium has an effect on the cathode drop. The appellee has not proven that the button electrode with cæsium is equivalent to an electrode of the same area without cæsium. It does not establish the inventor's rule to be erroneous.

Reference is made to the Bureau of Standards script tubes. These are alleged to have been made by Dr. Nutting, of the Bureau of Standards, and the tubes to have been fabricated by a glass blower of the Bureau of Standards. They were used for experimental purposes, one of which was said to contain neon, and were exhibited in April, 1910. The inventor's effective filing date for the patent in suit is November 28, 1910, at which time he filed an application in France for a corresponding French patent. Dr. Nutting's testimony substantiates this date, but it was brought out in the testimony that the neon gas used in the script tube was obtained from the patentee of the patent in suit. The records show a requisition by the Bureau of Standards on the patentee for a liter of neon gas, dated June 22, 1911, and at the bottom of the requisition sheet reference was made to the cancellation of the order and to a superseding order of March 1, 1912, and a delivery as of May 7, 1912. The patentee's bill covering the liter of neon gas shows delivery as of May 7, 1912. This written testimony, as against the recollection of the witness, sufficiently outweighed it, and there is a failure to carry back the date by proof beyond a reasonable doubt. National Hollow B. B. Co. v. Interchangeable B. B. Co. (C. C. A.) 106 F. 693, 703.

The testimony of Dr. Tugman also supports the appellant's claim that the appellee has not established that the tubes were made

before this invention. Cantrell v. Wallick, 117 U. S. 689, 6 S. Ct. 970, 29 L. Ed. 1017; Greenwald Bros. v. La Vogue Petticoat Co. (C. C. A.) 226 F. 448. The spectrum analysis tubes, which are laboratory instruments and comparatively small in size, are referred to as prior art. The usual tube is five or six inches long and with a one or two millimeter bore, while illuminating tubes are usually as long as 12 or 15 feet. The purpose of the spectrum analysis tubes is to study the nature of the gas and its impurities. They are useful notwithstanding these impurities, and their proportions, and conditions of operating them, result in a "capillary phenomenon" which to a large extent overcomes the effects of the impurities in these tubes. The conditions made it impossible to purify them with prior art methods or pumps. They were hot, while the inventor's tubes were cold. The spectrum tubes are different from the patentee's illuminating tubes, not only in their size, proportions, and characteristics, but in the use made of them. Their peculiarities of construction and condition made them unfit to perform that different function necessary to teach how to make an illuminating tube. On the contrary, such peculiarities prevented them from use as illuminating tubes.

The prior art literature—Soddy & Mackenzie paper, the Baldy paper, the Nutting papers, and the Nutting and Tugman paper —are referred to as prior information of prior uses; but there was no method available by which spectral tubes could be really purified until the patentee invented his method of purifying neon in the tube, or until modern pumps or modern methods of pumping were devised. The capillary of the spectral tubes, with its ability to make the spectrum of the predominant gas show in the capillary in spite of impurities, and the ability to recognize and describe the spectrum lines of gases already known, made the spectral tubes useful for their intended purpose, even though they were not pure. But in a commercial tube, for illuminating purposes with neon, there being no capillary, the whole success depended upon substantial freedom from impurities to the extent that the spectrum will not be affected. None of the papers referred to discloses the solution of the problem which this inventor accomplished.

[1] The Goetze British patent, No. 10,532 of 1903, recognized that impurities exist in all of these tubes, and speaks of the difference in impurity of the spectrum in different portions of the capillary, and the object of his improved construction was to enable the observer to see the spectrum where it is pure.

It shows cylindrical electrodes. But there is no reference to electrodes having any particular function in the tube. The patent relates to the use of a capillary within another tube. The Moore patents and tubes contribute the so-called "breather valve." This valve was able to make a luminous tube that would have a long life, not because the gas would last long, but because it supplied the means of introducing new charges of gas every half minute. The Cooper Hewitt lamp is a mercury vapor lamp, and not a gas lamp. Nor is this inventor's patent, No. 1,131,910, prior art to the first patent in suit. Traitel Marble Co. v. Hungerford Brass & Copper Co. (C. C. A.) 22 F.(2d) 259. Section 4886 of the Revised Statutes (35 USCA § 31; Comp. St. § 9430) makes only knowledge or use by others a bar, and such knowledge and use must be before his invention or discovery.

[2] The error below, we think, was reading into the claims of the particular method of purification of the neon in the tube. Using this combination, the patent in suit has brought about a new and useful result, which is commercially new and has had substantial value, as shown by its reception in the trade. Whatever may be said of its simplicity or the previous knowledge of electrical engineering, it has proved to be an invention of merit, a result of inventive thought. The rule is now well established that, for such inventive thought, protection should always be accorded the inventor. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, 31 S. Ct. 444, 55 L. Ed. 527; United Shirt & Collar Co. v. Beattie (C. C. A.) 149 F. 736; Marconi, etc., v. De Forest, etc. (C. C. A.) 243 F. 560. The commercial success obtained makes it apparent that the patent is most efficient, serviceable, and attractive. It has formed the basis of a substantial industry. Temco Electric Motor Co. v. Apco Mfg. Co., 48 S. Ct. 170, 72 L. Ed. —— (U. S. Sup. Ct. Jan. 3, 1928).

[3] As to the second patent in suit, No. 1,-191,495, it is clear that a tube made within the specifications and claims of the first patent in suit would practice the claimed invention of the second patent. The first patent in suit specifies:

"Now, if neon behaves in such a different manner, it is due to the property, hitherto unknown, of being absorbed to a remarkably less degree by the electrodes than all the other gases, and especially helium."

Applying a tube made in accordance with the first patent in suit to the claim sued on in this second patent, it will be observed that it comprises a closed receptacle containing

electrodes having a surface area large enough to practically avoid absorption of neon during operation. The two patents specify identically the same thing with respect to the size of the electrode. The first necessitated the establishment, within the receptacle, of highly rarefied atmosphere containing neon. The structure made in accordance with the first patent operates by passing an electric discharge between the electrodes, and this discharge is maintained throughout the life of the tube in normal operation. The first patent anticipated everything disclosed in the method of operation referred to in the claim of the second patent sued on as the method of obtaining neon purified. We agree with the court below in holding that the patentee here sought by the second patent in suit to secure a monopoly of a process of what inherently happened in a normal and intended operation of the device made out of the first patent. The aging which occurs in the operation of the process of the second patent occurred in the operation of the first. To practice the first invention would be to practice the process of the second. We hold this patent invalid.

[4] Patent No. 1,125,470 is held to be valid and infringed as to claim 1.

Decree modified.