RAINBOW LIGHT, Inc., v. CLAUDE NEON LIGHTS, Inc.

No. 212.

Circuit Court of Appeals, Second Circuit.

April 7, 1930.

William H. Davis, Dean S. Edmonds, and Leslie B. Young, all of New York City, for appellant.

William Bohleber, of New York City (Edwin J. Prindle and William Bohleber, both of New York City, of counsel), for appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

The patent in suit relates to luminous electrical discharge tubes, particularly to discharge tubes which are filled with rarefied gaseous neon. It is based upon the knowledge that it is of greatest importance that rarefied gaseous medium such as neon be and remain substantially free of impurities tending to adversely affect luminosity of the neon when the tube is in use. The invention provides a process by which glass walls of the tubes are given a purifying treatment preliminary to the introduction of the neon. This treatment eliminates potential impurities which would otherwise be evolved from the glass during normal operations and would contaminate the gas and impair the distinctive color of the light. The tubes, it is claimed, by this treatment are complete and ready for operation upon the introduction of the rare gas. And the gas therein is present at a uniform pressure, whereas, with prior methods of manufacture, evolution of the potential impurities from the glass walls had to be effected by action of the rare gas itself, and final perfection had to be attained by an aging process which required hours and lacked uniformity in the gas pressure in finished tubes. Below the appellant failed because of a noninfringement defense.

Claims 1, 2, 3, 4, 5, and 8 are in suit. Claims 1 and 2 are typical, and are as follows:

"1. The method of making a luminous electrical discharge tube, containing a conducting gas of the noble gas group, which comprises purging the walls of the tube by means of an agent adapted to coact with substances capable of absorbing or contaminating the gas during operation of the tube to an extent sufficient to commercially impair the color or amount of light produced, and thereafter filling the tube with the conducting gas at low pressure and sealing the same.

"2. The method of making a luminous electrical discharge tube according to claim 1 in which the purging agent is an alkali metal vapor."

According to the claims and specifications, the tubes are connected to a vacuum pump and then heated, preferably in an oven, so that the heat dislodges most of the

occluded gases and volatile materials which are then carried away with the air in the tube during the evacuation by the pump. The tube is then subjected to a stabilizing treatment, the purpose of which is to eliminate the potential impurities. This treatment is performed by subjecting the walls of the tube to a bombardment by ions of an alkali metal. Bombardment is effected by the passage of the relatively high current through the vapor of the metal within the tube, and the discharge is continued for a period of time to insure that all the tube walls were subjected to the bombardment. The ions of alkali metal give the discharge a distinctive form, and it is said that one way of ascertaining the effect desired by the patent is to continue the discharge until this distinctive form is visible from end to end of the tube. This bombardment results in decomposition or breaking down of the potential impurities in the walls, which would otherwise be broken down by bombardment of neon ions. These impurities so eliminated are said not to be occluded gases because they cannot be eliminated merely by heating and pumping, but they appear to be decomposition products of the glass; the ion bombardment with the alkali metal carried on for the required length of time causes the nature of the glass wall to be changed to such a degree that further changes do not occur after the neon is introduced, and therefore, in the finished tube made by this process, the neon is not contaminated by these impurities during normal operation of the tube. There are two essentials to the process: (a) A discharge in the tube through the vapor of an alkali metal; and (b) the continuation of this discharge until all the walls have been bombarded by the ions of metal. By the specification, it is apparent that it was the intention of the patentee to cover all methods of introducing the metal into the tube in order to obtain the ion bombardment. The patentee describes two such methods.

We need not consider the question of validity of this patent, for we are convinced that the appellee, in manufacturing, does not practice appellant's patented process. Prior to this alleged invention, three processes of manufacture were known and used: (1) The charcoal and liquid air process; (2) the scavenging process; and (3) the aging process. These could be used separately or in combination, and the practice was to do as much as possible in cleaning the tubes of impurities in gaseous form and then introduce neon, evolve the latent impurities with resultant contamination of the neon, and then

remove these impurities from the neon. Claude Neon Lights v. E. Machlett & Son (C. C. A.) 27 F.(2d) 702. The appellee has never manufactured tubes under the patent in suit. The appellant's type of tube is of high frequency, which employs external electrodes as distinguished from low frequency tubes with internal electrodes, which the appellee manufactures. The appellee builds its internal electrodes in accordance with the Claude patent No. 1,125,476 considered in 27 F.(2d) 702. The patentee points out that there is very little energy developed within the external electrode high frequency type of tube disclosed in the patent, as compared with that of the internal type, since the current does not enter the tube directly from the source of supply—the electrodes are on the outside of the tube and are not in contact with the neon gas—the current which passes through the gas is the secondary or capacity current. And these secondary currents have a low average voltage; hence their energy is small, as the patent points out. In order to force this capacity current through the tube, the frequency of the current must be of a very high voltage, and the patent speaks of cycles of the order of 750,000 while the appellee uses ordinary commercial current of 60 cycles. The external electrode tubes used in the patent have not ability to age out the impurities from the neon in such tubes by passing current therethrough after they are finally sealed up. This only can be done with internal electrode tubes where the gas is in contact with the electrodes, for the impurities combine with the electrode material as the latter sputters off or electrically evaporates. Indeed, the invention claims the advantage of making possible the use of pressure of neon within the tube at 24 mil. of mercury, which is said to be increased from six to twelve fold over commercial practice and eliminating the need for purifying the final charge of neon and particularly for purifying it by aging. The appellee uses a pressure of neon of from 7 to 8 mil. of mercury, and it subjects all its tubes to aging; most of them are impure and require aging after the final charge of neon has been introduced.

The Claude patent, No. 1,191,395, issued July 18, 1916, is for the process of aging used with internal electrode tubes, and it is this process which the appellee practices. In the practice of the disclosure of this patent, the glass is heated to the highest possible point and, to any extent that salts of alkali metals can be possibly driven out of the glass, they will be driven out in such prac-

tice. And, assuming an interpretation of appellant's patent broad enough to cover perfection of a neon tube by a preliminary treatment in which a partial vacuum is formed and a discharge passed and the tube heated just short of collapse before the final charge of neon is placed in the tube, it would be anticipated by this patent. Claude describes purifying the electrode and the walls of the tube solely by producing a partial vacuum in passing an electrical discharge before admitting the neon and effecting entire perfection in that way or by first effecting perfection by producing a partial vacuum and at the same time sending current through and then afterwards purging the tube several times with a gaseous mixture which is to be finally used in the tube following each purging by action of the vacuum pump and of the current. If this is aging, the appellee has proved that it still ages its tubes, but perhaps not to the extent that it was required to do at first, and this is due to the fact that pumps are now more efficient. Moreover, it is testified that, with modern pumps, baking alone will deprive tubes of occluded gases without aging. It is further testified that, in the laboratory, in the manufacture of tubes, they bake the tube and heat the electrodes up by a high frequency coil without passing the discharge through them, and in this way obtain a pure batch. The heating was found to be purely a matter of diameter and the efficiency of the pumps.

The appellant argues that neither the Claude French patent nor the United States patent No. 1,125,476 contemplated an initial perfection by an initial electrical discharge through the vapor of an alkali metal before the neon is admitted into the tube, and that the best Claude did was to develop latent impurities by setting up an electrical discharge through the neon in the tube referred to as bombarding the walls of the tube with ions of neon, and subsequently removing the developed impurities either from the neon by the charcoal liquid air process or with the neon by the scavenging process. It argues that Machlett discovered that a preliminary electrical discharge through the vapor of an alkali metal, which is bombarding the walls of the tube with ions of an alkali metal, would completely develop and eliminate the latent impurities. Claude's French patent has an initial perfection by an initial electrical discharge through the vapor of an alkali metal before the neon is admitted into the tube; that is, before the final charge of neon which is to remain permanently in the tube. We pointed out in Claude Neon Lights v. E.

Machlett & Son, 27 F.(2d) 702, 704, the two alternative methods of purifying or providing the tubes with previously purified neon. The first of these was the charcoal liquid air method, and the most effective, because it required only proximately pure gas; second, a method of separate scavengings with an especially prepared and absolutely pure gas. The scavenging method required a larger quantity of neon than the carbon liquid air process.

Claude's patent disclosed a perfection of the tube by purifying it to such an extent that little or no more impurities will be evolved from the walls after the final charge of the neon has been put in, so that the neon will remain uncontaminated throughout the life of the tube. His patent disclosed such perfection both with the use of the vapor of an alkali metal and without such use, and by the use either of the charcoal liquid air method of perfection or the purging method, and both by purging with air and with neon, and with and without aging. Claude's aging patent, No. 1,191,495, describes the appellee's process of purifying its tubes, including the aging. The higher the temperature to which the appellee's tubes are heated, the more efficiently are the walls deprived of their occluded gases according to the testimony. When the tubes are thus heated, it is inevitable that some of the salts of alkali metals will be driven out of the walls of the tube.

Moreover, it is abundantly proven by the evidence that there has been no change in appellee's process with respect to the appearance of yellow in the tubes. From 1923 to the time of the alleged infringement, the witnesses who were in charge of the manufacture of the tubes testified that they gave no instructions to make tubes yellow throughout. The testimony clearly indicates that the only use of the yellow was an indication that the tube was reaching a danger point where it might collapse, for, when the yellow spots appeared, the tube was said to have reached that point.

The patent, in telling how to get alkali metal from the glass itself, describes the procedure placing two heating caps on the glass and heating the glass to a temperature to which it becomes electrically conductive and electrolyzing sodium out of the glass by "applying a direct potential of suitable voltage and polarity between these heated areas," and, it is argued, the appellee uses this process merely by raising the temperature of the tube and without using the heating caps and direct potential, but only using

the old ordinary alternating current discharge between the electrodes. A feature of the patent in suit is that it eliminates aging, and the appellee still ages its tubes. To that end, a preliminary current is passed through the tubes during the process and the impurities driven off by this current and are withdrawn by the pump.

The trial court found, upon satisfactory evidence, that there was no infringement, and nothing has been shown us which justifies the claim that this finding is contrary to the evidence. With that result, such finding, based upon persuasive evidence, will not be disturbed. Mason v. United States, 260 U. S. 546, 43 S. Ct. 200, 67 L. Ed. 396; Adamson v. Gilliland, 242 U. S. 350, 37 S. Ct. 169, 61 L. Ed. 356; Keeton v. Jefferson Standard Life Ins. Co. (C. C. A.) 5 F.(2d) 183; McGovern et al. v. McClintic-Marshall Co. (C. C. A.) 269 F. 911.

Decree affirmed.