ELECTRONS, Inc., et al. v. COE, Commissioner of Patents.

No. 6957.

United States Court of Appeals for the District of Columbia.

Decided Aug. 8, 1938.

John B. Brady, of Washington, D. C., and Clifton V. Edwards, of New York City, for appellants.

R. F. Whitehead, Solicitor, United States Patent Office, for appellee.

Before GRONER, Chief Justice, and STEPHENS and MILLER, Associate Justices.

STEPHENS, Associate Justice.

This is an appeal from an order of the District Court of the United States for the District of Columbia dismissing, after a

hearing on the merits, a bill of complaint filed by the appellants under Rev.Stat. § 4915, as amended, 35 U.S.C.A. § 63. The bill sought to authorize the appellee, the United States Commissioner of Patents, hereafter referred to as the Commissioner, to issue a patent for a gaseous discharge lamp on the application of Friedrich Meyer, Hans Joachim Spanner and Edmund Germer, No. 241,034. The application will be referred to hereafter as the Meyer application.

The application was filed on December 19, 1927, and included claims 49 to 51 and 53 to 57. All of these claims except 54 were rejected by the primary examiner on the ground that they did not disclose invention in view of a prior French patent to Risler, No. 607,650. Claims 49, and 53 to 56, were rejected upon the further ground that they contained "new matter," i. e., matter not disclosed in the specification. Claim 54 was rejected as not disclosing invention in view of United States patents to Kruh, No. 1,032,914 and to George, No. 1,671,109. The Board of Appeals reversed the primary examiner on all of these points and allowed all of the claims. Then the examiner suggested that, in view of the position of the Board of Appeals, another claim, 58, would be allowable, and the application was amended to include it. All of the foregoing, however, preceded the decision in the United States Court of Customs and Patent Appeals of In re Zecher, 70 F.2d 270, 1934, wherein it was held that Kruh and George taken together anticipated an application by Zecher and another for a patent upon a gaseous discharge lamp. After this decision the primary examiner requested that he be restored to jurisdiction of the Meyer application in order that he might reject all of the claims of Meyer as unpatentable over Kruh and George for the reasons set forth by the court in Re Zecher, supra. This request was granted and the examiner then rejected all of the claims upon the theory that the Meyer claims were similar to those involved in Re Zecher, supra, and that that case was binding upon the Commissioner. The Board of Appeals, upon the same theory, sustained the examiner, and then upon a petition for rehearing adhered to its own decision. The trial court followed the final ruling of the Board of Appeals, although it did not in terms refer to the Zecher Case in its findings of fact and conclusions of law. We discuss the claims in the Zecher Case and the ruling of the Court of Customs and Patent Appeals at greater length hereafter. The sole question presented for decision in the instant case is whether or not the disclosure of the Meyer application constitutes invention over the references cited by the Commissioner, particularly Kruh and George.

The principal object of the Meyer device is the production of ultra violet rays which, as is well known, are put to therapeutic use. These rays result from an electric discharge through mercury vapor. In the early stages of the art, they were produced through the use of a quartz lamp, a typical form of which is shown in the two drawings in Illustration A. This is a quartz tube containing at one end a pool of mercury to act as a cathode and at the other end a suitable anode, these two electrodes being connected to an outside source of electric current. Such a tube is shown in the upper of the two drawings. In operation the tube is tilted in such manner as to cause the mercury in the pool to flow along the bottom to the anode, as indicated in dotted lines in the lower of the two drawings, thereby forming a conductive thread of mercury connecting the

## ILLUSTRATION A

two charged electrodes. An electric current thus flows through the mercury thread, heating and vaporizing it. Then the tube is tilted back into such a position as to cause the mercury thread to break, and at the point of rupture the mercury becomes incandescent, and this continues vaporization of the mercury and results in the formation of an arc which recedes with the broken thread of mercury to the pool to form on the surface thereof an intense "hot spot." Such a "hot spot" has a temperature in excess of 2000° C and thereby mercury vapor is generated through which the electric current passes, producing a luminous column and causing ultra violet rays to be emitted through the pervious quartz wall of the tube. This quartz lamp has several disadvantages in respect of practical operation: In order to maintain the arc through the tube it is necessary to keep the hot spot from going out and this requires a large current, usually of the order of 5 amperes, and in consequence the amount of ultra violet rays emitted cannot be controlled below a certain minimum which is fixed by the amount of current necessary to maintain the hot spot. Again, the electric current will pass through such a quartz lamp only when the mercury pool is the cathode, i. e., the negative electrode; therefore the lamp can operate on direct current only, for if alternating current is used there will be no flow during one-half of each cycle and accordingly the hot spot will go out. Still further, the lamp must be tilted to start operation and when started it must thereafter be kept in a fixed position. Finally, because of the pool of mercury, such a lamp is not easily portable. Apparently because of these disadvantages the quartz lamp has not been put into commercial use except with modifications in the form of transformers, boosters and devices to control the flow of the current.

Steinmetz had pointed out as early as 1900 that what mainly underlay the disadvantages of the quartz lamp was the necessity of heating the mercury; and all through the early art attempts were made to meet this difficulty by resorting to auxiliary heating means such as a heater wire either in or adjacent to the mercury pool, or a high frequency current passing through the pool.

The Meyer application presents a device designed to produce ultra violet rays economically and efficiently and without the disadvantages of the quartz lamp. The device is defined in claims 49 to 51 and 53 to 58, all of which are involved in the instant suit. Claims 49 and 55 are typical; claim 54 involves the addition of an auxiliary electrode:

"49. A spectral ray lamp comprising an evacuated envelope forming an enclosed elongated discharge path, two fixed electrodes therein, one of which is a Wehnelt type cathode, and a low pressure gaseous atmosphere comprising a rare gas adapted to support a heavy current discharge, and a source of metallic vapor normally incapable of supporting a low voltage discharge in the envelope, the said discharge through the rare gas being adapted to raise the vapor pressure of the metallic vapor and the ionization of the same sufficiently to cause the metallic vapor to carry and maintain the discharge and become the main source of the emitted spectral rays."

"54. A metal vapor lamp of high capacity which can be started and operated directly from ordinary alternating house lighting voltages, comprising a vessel pervious to the desired spectral rays, two fixed main discharge electrodes spaced apart and forming with the walls of said vessel an elongated discharge path therein, at least one of said electrodes being a Wehnelt type cathode, an auxiliary electrode adjacent said cathode, an inert gas atmosphere, and a source of metallic vapor the pressure of which increases with rise in temperature; said cathode in cooperation with the gas atmosphere and said auxiliary electrode being capable of starting and maintaining a heavy current, low voltage gas discharge between said electrodes thereby forming an enclosed luminous gas column between the main electrodes adapted to raise the pressure of said metallic vapor and its density throughout the main discharge path sufficiently to cause it to support said low voltage discharge as the desired main source of spectral radiation.

"55. A metal-vapor lamp comprising a vessel adapted to provide a discharge path defined by the walls of said vessel, a Wehnelt type cathode and a cooperating electrode disposed at opposite ends of said path, and a filling of inert gas and metal vapor; the normal electron emission of said cathode and the pressure of inert gas being adapted to start and support a low voltage gaseous discharge in said path, the

said gaseous discharge being adapted to raise the metal-vapor density throughout the path sufficiently to make the metal vapor the main source of emitted rays."

kind, and 5,5 are the auxiliary or ignition electrodes associated with them. A suitable resistance 6 is inserted in the circuit including the auxiliary electrodes."

## ILLUSTRATION B

Fig. 1.    Fig. 2.    Fig. 3.

The structure thus described is shown in the drawings of Illustration B. The specification explains the drawings thus:

"Fig. 1 shows a tubular lamp 1, filled with a rare gas or gases, to which is admixed a metal vapor such as mercury vapor, 2,2 are glow cathodes supplied with alternating current.

"Fig. 2 illustrates a similar arrangement in which auxiliary electrodes 3,3 are associated with the glow cathodes 2, the auxiliary electrodes being arranged in close juxtaposition to the glow cathodes, so as to heat them up when heated by the current.

"In the modification illustrated in Fig. 3, 4,4 are glow cathodes of a different

The specification further explains:

"We have found that a source of chemically active rays is presented in the combination of a gas-filled tube, for instance an argon-or neon-filled tube, such as is in general use for the purposes of advertising, with an admixture of metal vapor, for instance mercury vapor, to the gas in the tube, the tube itself being preferably made of a material highly pervious to ultraviolet rays, such as quartz or uviol glass, or being provided with an opening closed by such material.

"If a voltage is connected with the electrodes forming part of such a tube, a glow current will pass between the electrodes which will also ionize the mercury

molecules which will now emit great quantities of ultraviolet rays. Owing to the presence, in the tube, of a gas, for instance a rare gas, besides the metal vapor, such lamp can be operated with alternating current and can therefore be connected directly with any house lighting system.

"We have further found that combined gas and metal vapor lamps for high capacity can be ignited easily without requiring a high voltage, if the ordinary (cold) electrodes are replaced by or combined with hot (incandescent or glow) cathodes. We may for instance use tungsten cathodes, but we have found it particularly convenient to use the kind of glow cathodes known under the name of Wehnelt-cathodes, which do not require any heating current, it being possible to cause the cathodes to be heated by the ion current itself upon the glow discharge having been started by means of one of the well known auxiliary connections. This latter mode of operation is particularly recommendable if it is desired to operate with direct current."

More briefly stated, what the Meyer application describes is a tubular quartz lamp, pervious to ultra violet rays, filled when manufactured with an inert gas such as argon or neon and with mercury vapor which when cool condenses into drops of mercury which adhere to the walls of the lamp. The lamp has metallic electrodes, one of which, the cathode, is of the so-called Wehnelt type. It is explained in the testimony that this type of electrode is coated with a metallic oxide such as barium oxide, and in consequence has the property of emitting electrons and thus permitting the passage of a large current upon the application of a relatively low voltage. The theory of operation of this lamp is that when an electric current is passed through the inert gas a heavy arc discharge results which heats the walls of the tube and also causes an ionic bombardment of the drops of mercury adhering thereto. Both of these effects cause vaporization of the mercury, which then becomes ionized and serves to carry the electric discharge with resultant emission of ultra violet rays. The amount of the latter can be controlled by varying the amount of current passed through the lamp. This is accomplished by the insertion of a resistance in series with the lamp.

In contrast with the quartz lamp of the early art above described, the Meyer device eliminates the mercury pool and thus the hot spot and the consequent necessity for a large current which interferes with lack of control of the rays below a certain minimum. Further, the elimination of the mercury pool and the addition of the rare gas make the lamp usable with alternating current, do away with the necessity of tilting for starting purposes, and permit use of the lamp in varied positions; also, the elimination of the mercury pool makes the lamp portable. Further, the use of the Wehnelt cathode, which results in substantial electronic emission at low voltages, and the adaptation to alternating current make the lamp usable in domestic electric outlets.

The invention claimed is not in the use as such of an electric discharge through mercury vapor to create ultra violet rays nor in the use of the Wehnelt cathode as such. In their brief appellants characterize "the broad new inventive conception of applicants" as:

". . . the creation of an intense discharge through the rare gas, made possible in the combination by the Wehnelt cathode, which rare gas heats the walls of the elongated tube uniformly throughout its length, and so raises and maintains the requisite mercury vapor pressure."

In short the invention is said to lie in the discovery that mercury may be vaporized (and thus placed in such a condition that ultra violet rays will be emitted when an electric discharge passes through it) by ionic bombardment caused by a heavy electric discharge (made possible by the use of the Wehnelt cathode) through an inert gas. The appellants assert that in the prior art the necessary vaporization of the mercury has been produced either by passing a current through liquid mercury, as in the case of the quartz lamp of the early art above described, or by auxiliary devices to heat the mercury.

But the Commissioner contends that the virtues of the Wehnelt cathode have long been known and that the principles employed by the appellants are disclosed by the prior art and especially by the patent to Kruh, No. 1,032,914, and the patents to George, No. 1,671,109 and No. 1,361,710. Reference is also made to a patent to Hull, Reissue No. 19,057.

The patent to Kruh is for what is termed a vapor electric apparatus. A drawing thereof, Illustration C, shows a highly ex-

## ILLUSTRATION C

hausted glass tube at the upper tip of which is located a positive metallic electrode 2 connected to one main 5 of an electric circuit of either direct or alternating current. The other main 6 of the supply circuit is connected to a lead-in 8 which extends up through the bottom of the tube and, without insulation, through the pool of mercury 9 and above its surface and supports one end of a small helix or glower 10. The other end of this helix is supported by a separate lead-in 11 which passes, within an insulating glass tube 12, through the mercury and is then connected to the supply main 5. The helix 10 is constructed of wire such as platinum or tungsten coated with a suitable oxide which when heated emits electrons. There is an auxiliary anode at 15 connected like the anode 2 to the main 5 but located much nearer the helix 10. This is to be used merely to facilitate starting and may be subsequently cut out by the switch 16.

The Kruh lamp has two purposes, the production of light and the rectification of alternating current. Only the former is of significance here. The lamp operates normally as a mercury arc. The appellants' expert witness James Burke thus described its operation:

"As I understand the operation of his tube, it is that he passes current through the conductor on which the coating of the cathode is placed, which heats that conductor, bringing the cathode into an emissive state, and the heat of that cathode also heats the mercury in three ways: one by its proximity to the mercury, being placed just above the mercury pool; one by the heating of the wire forming part of that cathode, which passes through the pool as shown on the lefthand side, this being shown as bare, contacting with the mercury, and conveying its heat into the mercury; and a third way being by the conduction of heat in the exposed part of the cathode above the mercury; so that he has the three ways by which heat goes into the mercury pool.

"Now, at the start, as he explains it, he gets a low intensity discharge between the emissive cathode 10 and the auxiliary electrode and after getting that started and the proper amount of ionization in the tube, that discharge goes away from the auxiliary anode 15 and establishes itself to the main anode 2.

"Now, he explains that when the current is increased it then changes from a low intensity to a high intensity lamp and, as I understand the principle that he explains, it is that the current which has been flowing from the coated cathode, part of the current will creep down the bare leg and contact with the mercury pool, establishing a hot spot on the mercury pool, so that he then has the mercury pool and hot spot lamp, the same as the earlier quartz lamps explained, and, in addition to that, he has some discharge from the coated cathode 10, the total discharge being divided between the hot spot on the mercury pool 9 and on the coated cathode 10.

"Now, the discharge which starts with sufficient current to start the hot spot is established by the mercury vapor getting into the tube, being formed in the tube by the preheating device previous to the hot spot getting started, which then starts the hot spot when the current reaches a sufficient amount."

Kruh also mentioned operation of his lamp without the cathode spot—when the apparatus is adjusted for small current. He describes this as follows in his specification: "When the apparatus is adjusted to take a small current I find that the operation apparently is not that of the ordinary mercury arc, for there is no cathode spot produced on the surface of the mercury, nor does there seem to be anything equivalent thereto. On the contrary, the current flow fills the tube with a brilliant illumination taking place through mercury vapor in the tube, which illumination in appearance, at least, is exactly like that of the well-known mercury arc lamp except that there is no cathode spot on the mercury and, therefore, absolutely no flickering or pulsation in the light."

Burke testified that the Kruh device could not operate in this way without the aid of

the helical cathode as an auxiliary heating device to produce some vaporization of the mercury.

The George patent, No. 1,671,109, discloses an invention relating to "a process and apparatus for increasing the emission in the ultra-violet region from mercury vapor lamps." George states in his specification that he has ascertained "that the higher the voltage and frequency of the [alternating] current supplied, the greater will be the radiation in the ultra-violet region." His specification describes the lamp itself in terms of a drawing, Illustration D, as follows:

## ILLUSTRATION D

"The mercury vapor lamp consists of a tube 1 in the shape of an inverted U made of transparent silica, connecting two vessels 2,2; the latter contain mercury and are fitted with the electrodes 3 .... Along the tube 1 there is attached or fused on a vessel 4, the dimensions of which are calculated so as to ensure stable operation of the lamp. The tube is preferably filled with an inert gas, such as argon or neon, at a pressure of some centimetres of mercury, the pressure of this gas has for its object to ensure the lighting or starting of the lamp and its operation on alternating current. If preferred, without departing from the principle of the invention, the mercury vapor may be utilized alone as gas, the tension of this vapor being raised by any suitable means, such as the heating of the vessel 2, to a value adapted to ensure the lighting and operation of the lamp."

In an earlier application which ripened into patent No. 1,361,710, George discusses in his specification the use of inert gases, saying:

"Ordinary mercury vapor lamps can only work when a continuous current is used. The present invention relates to a quartz mercury vapor lamp that can work with an alternating current; this result is obtained by utilizing, for starting the arc, an inert gas such as nitrogen, neon or the like, the lamp working as a luminescence tube, until the mercury is vaporized and the arc can pass through the mercury vapor."

In terms of a drawing, Illustration E, he describes the structure of this lamp thus:

"The lamp shown in Fig. 1 consists, essentially, of an illuminating quartz tube 1 connecting two small reservoirs or chambers 2 filled with mercury. These chambers are provided with electrodes 3, formed of tungsten wire 4 set in the quartz. The lamp contains an atmosphere of inert gas under a pressure of some centimeters of mercury. This pressure depends upon the diameter of the illuminating tube, for example, for a tube having an internal diameter of 15 mm., a mercury column of 1 cm. suffices. At each extremity of the tube 1 there is connected a reservoir 5. The lamp is mounted directly on the terminals of an alternating circuit whose voltage is in keeping with the nature of the gas constituting the atmosphere within the lamp; thus by employing an atmosphere of neon gas, the voltage can be 500 volts; this

ILLUSTRATION E

Fig.1

Fig.3

voltage can be increased if nitrogen be employed....

\* \* \*

"In the arrangement of Fig. 3, the two electrodes are formed by tungsten blades 7, and the mercury vapor for forming the arc is produced by small quantities of mercury 8 situated in the neighborhood of the electrodes 7 in appropriate receptacles."

George then describes the operation of this lamp:

"The functioning is as follows: On the closing of the interrupter, the tube is immediately lighted up as a luminescence tube, the arc passing through the inert gas atmosphere. The mercury which constitutes the electrode is at once vaporized; the intensity increases and passes from the order of luminescence to that of the arc in mercury vapor. The internal pressure exceeds 1 kilogram per square centimeter, and the arc assumes the form of a very brilliant cord. The presence of the inert gas necessary for starting off, should, it would seem, lower the efficiency of the mercury arc, but experience shows that, with the arrangement used, the gas and mercury vapor do not mix and that the gas tends, during the working, to localize itself apart from the arc in the cool portion of the tube. The gas localizes itself then in the reservoir 5, provided to receive it, and the illuminating tube will only contain vapor of mercury; these reservoirs thus have for effect the increase of efficiency."

The patent to Hull, Reissue No. 19,057, according to the brief for the Commissioner:

"...was not offered as an anticipation of the claims in suit but merely for the purpose of showing that in devices of this character it was not necessary to use a mercury pool but that a small quantity of mercury could be used ...."

The Kruh patent is important in that it discloses the use of an oxide covered or Wehnelt type cathode, and the idea that a luminous discharge through mercury vapor is possible without a hot spot and with a current of low amperage. This disclosure is substantially undisputed by the appellants, except that the witness Burke testified and the appellants in their brief urge that the Kruh tube cannot operate with a low current unless the mercury is vaporized by the auxiliary heating means of the helix. George is important as disclosing the use of a rare gas to facilitate electric discharge and to permit employment of alternating instead of direct current only. The appellants urge that George's specification in patent No. 1,671,109 states that the rare gas may be omitted and the mercury vaporized by any suitable auxiliary heating device. Nevertheless the specification does disclose the idea of the use of inert gas to accomplish the results mentioned. The appellants urge also that George uses gas at a "pressure of some centimeters of mercury" and they contend

that the use of gas at high pressure will result in "a snaky discharge." But neither the Meyer claims nor the specification disclose the pressure of the rare gas used in the Meyer tube, and we agree with the statement of the Board of Appeals in the second decision that:

"It seems to us it is only necessary to obtain a teaching from George of the use of argon or neon as an inert gas in the starting of a spectral ray lamp and that one skilled in the art would select a satisfactory pressure condition of such gas so as to prevent any wavy or irregular discharge."

We conclude that Kruh and George disclose the elements of the Meyer device. What Meyer and, through him, the appellants claim is fundamentally a device combining two principles: (1) that an electric discharge through mercury vapor between two metallic terminals, one of which is a Wehnelt cathode, rather than between one metallic terminal and a cathode of liquid mercury, will result in radiation of ultra violet rays; and (2) that a heavy electric discharge through a rare gas will result in ionic bombardment of the walls of the tube and of the drops of mercury condensed thereon and consequent mercury vaporization.

The Commissioner contends that, stripped of the limitations stated in functional terms, the claims in the Meyer application are literally anticipated by the substitution of the rare gas of George in the Kruh tube. To this argument the appellants make two answers: first they say that there was no reason why inert gas should be added to the Kruh lamp because Kruh employed an auxiliary heater to heat the mercury pool, and in consequence there was no need of the rare gas to vaporize the mercury; and the appellants point out that the Board of Appeals took this point of view in its first opinion, where it said: "It seems unnecessary in such arrangement to provide the neon or argon as an aid to starting." Second, say the appellants, even if rare gas is added to Kruh and Kruh's auxiliary heater dispensed with, the resulting structure is not the equivalent of the Meyer tube. The appellants argue that the large diameter of the Kruh tube and Kruh's statement that a low current is to be used negative any suggestion of causing enough ionization of the rare gas to heat the walls of the tube and thereby to heat the mercury. And the appellants conclude by urging that, even if changing the shape

of the Kruh tube would result in such discharge through the rare gas as would alone create and maintain the necessary mercury vapor pressure, such a change was not obvious and would result in a wholly new type of lamp.

The Commissioner further contends that in Figure 3 of George No. 1,361,710 (Illustration E, supra), is shown a mercury tube, two pools of mercury, and two metallic electrodes adjacent to the pools, and that if for one of these metallic electrodes a Wehnelt type electrode is substituted, the resulting structure will be an embodiment of the structure of all of the Meyer claims. The Commissioner argues that the Wehnelt cathode and its characteristic property of increasing the emission of electrons upon the application of a relatively low voltage were well known and that the substitution is accordingly one within the skill of the art. In answer to this the appellants say that while it is true that the Wehnelt cathode and its characteristic property were well known, the art did not regard it as suitable for use when subjected to heavy ionic bombardment.

The general principles applicable to the question whether invention exists in a combination of elements are briefly: The fact that all the elements entering into a combination are old does not necessarily negative the existence of invention. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527, 1911; Iron Fireman Mfg. Co. v. Industrial Engineering Corp., 89 F.2d 904, 7 Cir., 1937. Such a combination may be patentable invention if it produces a new result, or an old result in a new or more efficient way. Independent Oil Well Cementing Co. v. Halliburton, 54 F.2d 900, 10 Cir., 1932; N. O. Nelson Mfg. Co. v. F. E. Myers & Bro. Co., 25 F.2d 659, 6 Cir., 1928; see Walker on Patents (Deller, 1937) 147–149. The fact that a combination later appears to be a simple one does not necessarily negative the presence of a high degree of inventive genius. Webster Loom Co. v. Higgins, 105 U.S. 580, 26 L. Ed. 1177, 1881; Diamond Rubber Co. v. Consolidated Rubber Tire Co., supra. On the other hand, if a combination is the result of mere mechanical skill applied to an idea or ideas previously disclosed, it is not invention. Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997, 1935; see Walker, op. cit. supra, 138–145.

On the general subject of combinations as invention see Claude Neon Lights, Inc., v. E. Machlett & Son, 27 F.2d 702, 2 Cir., 1928; In re Armstrong, 83 F.2d 924, Cust. & Pat.App., 1936, and Wach v. Coe, 64 App.D.C. 235, 77 F.2d 113, 1935; and as illustrating a somewhat liberal rule in this jurisdiction in respect of combination inventions see In re Eastwood, 33 App.D.C. 291, 1909, and In re Lower, 50 App.D.C. 159, 269 F. 675, 1920.

We reach the conclusion that despite Kruh and George the Meyer lamp is an inventive combination. Without dispute there was need in the art of an ultra violet ray producing device free from the disadvantages which are described at the outset of this opinion; and clearly enough the Meyer device accomplishes that result. It produces ultra violet rays in a much more efficient way than before. While improvement in method through the Meyer structure may seem obvious now, we are impressed with the arguments of the appellants that it was not obvious from the prior art. We are especially impelled to the conclusion that the appellants' device is inventive over Kruh and George because that conclusion was reached by the Board of Appeals itself in its first decision and obviously would be the present view of the Commissioner except for In re Zecher, supra.

In In re Zecher, supra, application had been made for a patent on certain improvements in "gas-filled incandescent cathode discharge tubes." Both the primary examiner and the Board of Appeals in the Patent Office rejected certain of the claims and the applicants appealed to the Court of Customs and Patent Appeals. That court quoted as typical of the claims involved the following:

" '13. An electric discharge tube comprising in combination a wall consisting at least partly of a material transparent to ultra-violet rays, a solid incandescent cathode, at least one solid anode, a quantity of mercury and a gas.'

" '19. An electric discharge tube as specified in claim 13 in which the temperature of the discharge, at the tension employed, is of the order of magnitude of some hundreds of degrees C.' " [70 F.2d at page 270]

And the court stated the disclosure of the Zecher application to be:

". . . an electric discharge tube having an outer glass wall, and an inner quartz wall transparent to ultra-violet rays. The tube is so arranged that objects which are to be treated with ultra-violet rays may be inserted within the interior of the quartz tube and subjected to the action of the rays. The tube has one cathode, two principal anodes, and one auxiliary anode situated close to the cathode, used in starting the discharge within the tube. The cathode is, preferably, constituted by a tungsten helix which has wound on it a nickel wire, and the cathode is superficially coated with barium oxide. The discharge tube contains a small quantity of mercury and argon, the argon being to facilitate the discharge...." [70 F.2d at page 270]

Holding the claims unpatentable over Kruh when considered with George No. 1,671,-109, the court said:

"The reference Kruh discloses a discharge tube having one incandescent cathode and two anodes, one of these being auxiliary, a body of mercury within the tube, and the cathode coated with an oxide.

"The patent to George makes a complete disclosure of the use of quartz envelopes as a source of ultra-violet rays. This patent also fully discloses the use of mercury and of an inert gas, such as argon or neon, to insure easy lighting and starting of the mercury lamp....

"A reading of claims 13, 14, 15, and 16 discloses that every element in these claims is anticipated by the prior art, as shown by the references. The said claims are so drawn that they will read upon a glass tube equally as well as upon a quartz tube. It is shown by the record that glass is transparent to ultra-violet rays to a certain degree. Even if this were not true, the claims are so drawn that the references, inasmuch as they disclose the use of quartz envelopes, fully cover the field of these claims." [70 F.2d at page 270]

We have respect for the decisions of the Court of Customs and Patent Appeals as an expert tribunal in patent cases, and if In re Zecher, supra, were a decision which principally considered the same issue as that in the instant case, and if the court in Re Zecher, supra, had had the advantage of the testimony and of the briefs in the instant case, we should regard it as highly persuasive. But from examination of the record and briefs in Re Zecher, supra, the

424

following appears: Zecher's discharge tube was shaped like a wide "U". The three inner surfaces of the tube were made of quartz, because of its perviousness to ultra violet rays; and the outer surfaces were made of glass because of its property of being largely impervious to ultra violet rays. It was explained in the brief for Zecher that ultra violet radiation can cause severe burns upon the human body, and it was stated that the purpose and object of the invention was to enable ultra violet ray treatments to be given by inexperienced workers in a safe, economical and effective way. And it was explained that with the tube shaped and fabricated of combined glass and quartz as above described, that portion of the human body to be treated could be surrounded by the quartz and thus exposed to ultra violet radiation, whereas the operator would be largely protected against exposure by the exterior glass walls. And the issue principally discussed in the briefs, both of Zecher and of the Commissioner of Patents, was whether or not an ultra violet ray discharge tube shaped and fabricated as above described, with the principal object of safety for the operator, was invention. No such question is presented in the instant case. Moreover the record in Re Zecher, supra, shows that neither the Court of Customs and Patent Appeals nor the tribunals of the Patent Office had the advantage of testimony like that in the instant case, and it was therefore not made apparent either in the court or in the Patent Office in Re Zecher, supra, that the combination of elements and principles involved in the Meyer application—and possibly under the Zecher claims—would result in elimination of the disadvantages of the early art and the accomplishment of production of ultra violet rays in a much more efficient way.

We think accordingly that In re Zecher, supra, is largely without persuasive value for the instant case, and being convinced on our own part that invention resides in the Meyer claims and that the first decision of the Board of Appeals thereon to such effect was sound, we conclude that a patent should have issued to the appellants and that the trial court should have so ruled. This decree is therefore

Reversed and the case remanded for further proceedings in accordance with this opinion.