**SCHICK DRY SHAVER, Inc., et al. v. MOTOSHAVER, Inc., et al.**

No. 1274(J) M.

District Court, S. D. California, Central Division.

Dec. 6, 1937.

William Gibbs McAdoo, of Los Angeles, Cal., Abraham Tulin, of New York City, and E. Walter Guthrie, of Los Angeles, Cal., for plaintiffs.

Oscar A. Mellin, of Oakland, Cal., and Hill, Morgan & Bledsoe, by Kenneth K. Wright, all of Los Angeles, Cal., for defendants.

McCORMICK, District Judge.

This is a suit in equity for the infringement of three patents. All of the patents are for shaving implements or shaving machines and were issued to Jacob Schick. They are respectively No. 1,721,530, No. 1,747,031, and No. 1,757,978. The first and second named complainant corporations are, respectively, the exclusive licensee and the owner of the patents in suit, and the last-named plaintiff is the sole distributor throughout the State of California of the "Schick Dry Shaver," a device which em-

bodies the inventions of the patents in suit.

The defendant companies are California corporations; the first named having a regular and established place of business in Los Angeles, and the other having a regular and established place of business in San Francisco. The defendant Dalmo Manufacturing Company manufactures the alleged infringing shaving device, called "Dual-Head Motoshaver," for the defendant Motoshaver, Inc., in the Northern Judicial District of California.

The defendants are charged jointly in the verified bill of complaint with manufacturing, offering for sale, and selling, within both the Northern and Southern Judicial Districts of California, a shaving implement embodying the inventions of the patents in suit and known as "Motoshaver" and "Dual-Head Motoshaver." It is further averred that such joint infringing conduct and activities have taken place after knowledge of complainants' patent rights.

The matter immediately before the court is an application by complainants for a preliminary injunction to restrain defendants fom manufacturing, offering for sale or selling types of "Dual-Head Motoshaver" pendente lite.

The proceeding is based upon the allegations of the verified bill of complaint and supporting affidavits filed simultaneously with the primary pleading upon which an order to show cause was issued. Responsive thereto defendants appeared, Dalmo Manufacturing Company specially to object to this court's jurisdiction over it and further to quash the Marshal's service of process upon it at San Francisco, California.

At the hearing of the order to show cause, the defendants filed affidavits on the special plea of jurisdiction and also controverting averments of the bill of complaint and the supporting affidavits, and also raised new matter, to which complainants upon motion were given permission to file and did file rebuttal affidavits. The motions are submitted on the record thus made and after arguments and memoranda of authorities of solicitors for the respective suitors.

■ There is and can be no question raised as to the complainants' title to letters patent No. 1,721,530, or as to the right of complainants to sue for the infringement thereof. The bill of complaint and the undisputed affidavits show that these patents have been litigated in contested suits brought by the aforesaid exclusive licensee and owner in the District Court for the Eastern District of New York, Schick Dry Shaver v. Dictograph Products Co., 16 F.Supp. 936, and upon appeal from a decree of such court in the Circuit Court of Appeals for the Second Circuit, Schick Dry Shaver v. Dictograph Products Co., 89 F.2d 643, and both courts have sustained the title of such complainants to this patent and have held it valid. The appellate court judges, in the decision rendered April 5, 1937, were unanimous on the issue of invention, but divided upon the scope that should be allowed to the claims of the patent, two holding the claims to have been narrowed by a British patent, No. 753, to Appleyard, issued in 1914, for improvements in shaving or hair cutting appliances, while the third Circuit Judge substantially opined that Schick was what Chief Justice Taft characterized in Eibel Co. v. Minnesota Paper Co., 261 U.S. 45, 63, 43 S.Ct. 322, 328, 67 L.Ed. 523, as a meritorious improver in the nature of a pioneer inventor whose valid patent claims are entitled to liberal and broad treatment. Schick Dry Shaver, Inc. et al., v. Dictograph Products Co., Inc. (D.C.) 16 F. Supp. 936; Id. (C.C.A.) 89 F.2d 643, 648; Id. 33 U.S.P.Q. 350. The opinions of the trial court and of the appellate court in these former adjudications disclose that the whole prior art was considered and expert witnesses were examined and their evidence weighed preliminarily to the findings by such courts of patent validity of claims 1 and 13 of patent No. 1,721,530, and the record here presents no new evidence affecting the issue of patentability and invention. Under such facts, the sole question on the petition for preliminary injunction before this court is whether the evidence as to infringement is such that it has been clearly shown that the patent rights of complainants under either claim 1 or claim 13 of patent No. 1,721,530, issued July 23, 1929, upon an application filed March 31, 1928, have been invaded and infringed by either or both devices of defendants. Kings County Raisin & Fruit Co. et al., v. United States Consolidated Seeded Raisin Co. (C.C.A.9) 182 F. 59, 61.

■ In the case just cited, which is an instructive exposition of controlling principles that are strikingly applicable to the problems before us, Circuit Judge Gilbert

stated the rule governing preliminary injunction proceedings in patent litigation in our circuit as follows: "It is held that, to entitle the complainant to a preliminary injunction in a suit for the infringement of a patent prior to a trial on the merits, he must show three things: First, a clear title to the patent; second, its presumptive validity; and, third, threatened infringement by the defendant."

The first and second requirements have been met by the complainants, as found in the authoritative judicial pronouncements already mentioned, and moreover there has been undisputed evidence submitted in this proceeding that conclusively establishes (1) clear title to the patent to vest in complainants, and (2) validity of claims 1 and 13 of Schick patent, No. 1,721,530.

The main question for decision is therefore whether or not the third requirement, viz., infringement by defendants of either or both of such claims of such patent, has been so clearly shown as to entitle the complainants to an injunction pendente lite.

Preliminarily to a consideration of this question, there are some further uncontroverted facts that have been established that should be mentioned, as they throw considerable light upon the equities that are present in the situation before the court at this time.

Until Schick's invention in 1929 there had never been commercially produced or marketed a practical and workable dry shaver. The popularity and success of this new and useful instrumentality of comfort and personal convenience is reflected in the growth of commercial production and sales from 3,200 Schick shavers in 1931–1932 to more than 722,000 Schick shavers in the calendar year 1936, the total number of shavers sold by the Schick Company since 1931 to the time of the filing of this suit in October, 1937, being approximately 1,500,000. Since the introduction of the dry shaver of complainants on the Pacific Coast sales have increased yearly from a low of 5,610 in the calendar year 1933 to a yearly high of over 142,000 in 1936. The retail sales in this area have aggregated approximately $4,000,000, and have been sold by about 7,500 retail dealers. This business has been built up at a cost of approximately $400,000 for advertising, education, and sales promotion in the Pacific Coast area.

The greatest and most profitable market for the devices that embody the inventions described in the patent is in the last three months of the year, on account of the adaptability of the "Shaver" as a holiday gift. It has been the experience that since 1931 more than 50 per cent. of the sales of complainants' product are made in October, November, and December. In order to maintain its manufacturing and sales force of about 1,450 persons, it will be necessary to supply a normal consumptive market for complainants' product, and a vigorous advertising and selling campaign launched in September of this year by defendants threatens to affect seriously the sale of complainants' product and the patent rights of complainants, the defendants offering their shaving devices at the retail price of $12.50 as against $15 for complainants' commercial embodiment of the patented shaver. In addition to this reduction in price, defendants are offering to their sales force and to dealers certain pecuniary advantages as inducements to holiday sales of their shaver in competition with the patented shaver of complainants.

The defendant Motoshaver, Inc., shows that it commenced the manufacture and sale of its dry shaving devices in September, 1936, and has made different types of shavers since, having supplanted the one first produced by a new and different construction in September, 1937, the earlier model having a trade name "Motoshaver" and the later being labeled "Dual-Head Motoshaver." Since September, 1936, more than 30,000 devices under the trade-name "Motoshaver" have been sold, and a wide distribution has been effected throughout the United States in its business which is valued in excess of $150,000. It is further averred that despite its wide distribution and extensive advertising and selling campaign since September, 1936, complainants did not until September 29, 1937, notify defendant Motoshaver, Inc., that it was claimed that defendant's activities were in conflict with complainants' patent rights. This was approximately six months from the time of the decision of the Second Circuit Court of Appeals sustaining the validity of the patent.

It is further stated by defendant Motoshaver, Inc., that there are upon the market at least seven other electrically operated dry shavers which claim to be without the claims of complainants' patents. It is not contended, however, that any of these or defendants' devices had been manufactured or placed upon the market until after complainants had built up a successful business

throughout the United States with Schick's patented shaver.

██ Undoubtedly the respective equities should be considered in this injunction proceeding, and they have been weighed in reaching a decision. Nevertheless, it is considered that if all of the requirements stated in the Kings County Raisin Company Case, supra, have been clearly established the complainants should not be required to await relief until a final hearing of the suit can take place and thereby be deprived of substantial benefits which market conditions may secure to them under their patent rights. Such a course of procedure would prevent the complainants from obtaining the speedy, adequate, and complete remedy which equity is designed to administer in patent infringement suits. The compulsory cessation of infringing activities is always inconvenient and financially injurious to the infringer, but such consequences should not dissuade a court of equity from administering timely relief in clear cases.

The question of infringement here is entirely dependent upon the proper scope that is to be given to the two claims of the first patent to Schick. The majority opinion of the Second Circuit Court of Appeals, to employ the language of the dissenting judge, "concedes that Schick's patent is valid and that his invention was a great improvement over Appleyard," and the controlling opinion itself contains these significant statements as to the advance made by Schick in the art involved: "When Mr. Schick made his invention in 1929, there seems to have been no dry shaver which was a commercial success. * * * Soon after it appeared on the market, Schick's shaving implement came to be commonly known as an electric dry shaver, and, both because of its inherent worth and intelligent sales methods, went into widespread use, despite sales resistance due to a comparatively high price, its radical departure from the common razor method of shaving, and the severe economic depression which soon followed its appearance."

There had been, prior to Schick's invention, considerable work done in attempts to solve the problem of producing a dry shaver that would operate successfully. This desideratum remained unsatisfied until Schick conceived and produced his shaver and obtained a patent for it. The record before us clearly shows that after examination and consideration of the entire field, both in the United States and abroad, all earlier attempts at a solution of the problem were "laid aside" by the appellate court of the Second Circuit with the pronouncement that they presented "so little in common with Schick" as to require no further comment. The sole citation which persuaded the majority of the appellate court to deny to Schick a broad interpretation of the two claims of his patent is the British patent that has been referred to earlier in this memorandum.

With great respect for the decision of a court of superior authority, we think that the controlling opinion in the Second Circuit attributes to this foreign patent of 1914 too prominent a place in the art of producing a practical and successful dry shaving device.

██ The fact that for a period of fifteen years no one, with Appleyard's patent and teaching, had been able to produce or market a commercially successful dry shaver does in my opinion, and did in the more weighty opinion of the third member of the appellate court, raise the Schick patent to the status of a very useful invention which has substantially advanced the art. If our conclusion is justified and correct, then the meritorious improver may rightfully invoke the application of the rule, "Ut res magis valeat quam pereat," to the end that he may enjoy all the fruits of his discovery. Eibel Co. v. Minnesota Paper Co., supra.

In view of the diversity of opinion of the Circuit Court of Appeals as to whether Schick's two claims should be broadly or narrowly construed, the commercial and practical success of Schick's invention and the marked industrial advance that has followed the Schick patent in the production of workable dry shavers warrants the conclusion that Schick should be made secure in his patent rights. This cannot be done if the claims are narrowly construed and if infringement is to be found only in dry shaving devices which are approximate copies of the Schick device. Stebler v. Riverside Heights Orange Growers' Ass'n (C.C.A.9) 205 F. 735.

██ The recent decision of the Supreme Court in Smith v. Snow, 294 U.S. 1, 14, 55 S.Ct. 279, 284, 79 L.Ed. 721, states the principle of construction which, under the record before us, we think is applicable to Schick's claims, as follows: "it is plain from what has been said that the character of the patent and its commercial and practi-

cal success are such as to entitle the inventor to broad claims and to a liberal construction of those which he has made. Morley Machine Co. v. Lancaster, 129 U.S. 263, 273–277, 9 S.Ct. 299, 32 L.Ed. 715; Eibel Co. v. Paper Co., 261 U.S. 45, 63, 43 S.Ct. 322, 328, 67 L.Ed. 523; Winans v. Denmead, supra [15 How. 330, at page 341], 14 L.Ed. 717. In such circumstances, if the claim were fairly susceptible of two constructions, that should be adopted which will secure to the patentee his actual invention, rather than to adopt a construction fatal to the grant, Keystone Manufacturing Co. v. Adams, 151 U.S. 139, 144, 145, 14 S.Ct. 295, 38 L.Ed. 103; McClain v. Ortmayer, 141 U.S. 419, 425, 12 S.Ct. 76, 35 L.Ed. 800.''

But regardless of our own belief as to how much information or knowledge Appleyard contributed to the known art when Schick made the first commercially successful dry shaver, it is clear that under the decision of the Circuit Court of Appeals the defendants' devices are substantially dissimilar in construction, mode of operation, and results to the suggested shaving implement that is described in this British reference, and that the "Motoshavers" are substantially identical with Schick's patent as it is interpreted by the controlling opinion of the Second Circuit Court of Appeals. The Appleyard type of shaver is provided with tapered cutting teeth, thick at the base and narrowing down gradually to knife edge points whose ends are exposed, to which exposed points the hairs to be cut enter by reason of an opening immediately in front of such points; the hairs approach and encounter the points similarly as in the Gillette safety razor, a separate guard being positioned over the pointed tapered teeth to protect the skin from laceration or injury.

This described shearing head cuts the hairs only on the single lines formed by the exposed points of the two rows of tapered teeth.

The shearing means of the "Packard Lektro Shaver," which was the device that was considered by the two federal courts in the cited Second Circuit case, was decisively found to have, "instead of a shear plate of extreme thinness throughout with narrow slots extending from side to side, the Packard shaver has as its shear plate one side of a cylinder having one comparatively large slot running nearly from end to end, making an opening along most of the central portion of that part of the shear plate which comes in contact with the surface to be shaved. The walls of the cylinder are made to taper down to thin edges on either side of the slot and those edges are cut into finely spaced teeth; the spaces being large enough to admit hair but small enough to exclude the skin. Within this cylinder is another of like shape slotted and toothed."

There is substantial identity of cutting means between those stated in the Appleyard patent and those found in the Packard device that was considered in the federal court in New York, while no identity appears between Appleyard and the defendants' shearing head, of which more will be said later in this memorandum. The construction principles, mode of operation, and results attained with defendants' shavers are more than clearly within the two claims of the Schick patent as such claims are construed in the Circuit Court decision.

Patent No. 1,721,530 is for a shaving machine, and the object of the invention is succinctly stated by the patentee in the specifications of the patent as follows:

"This invention relates to an improved shaving implement that has a shear plate that rests against the face and has a cutter operating under the plate to cut the hairs. The machine can be used for shaving without the use of lather.

"The invention comprises an implement in which the shearing action takes place practically on the surface of the skin as the shearing plate or its equivalent is extremely thin. The thin plate is held in place against flexing and collapsing under inward pressure by the cutter which is disposed inside the shearing plate to cooperate with it in shearing and to support it against flexing.

"The invention also comprises various details of the construction, which details will be more fully set forth hereinafter and will also be embodied in the claims. * * *

"The implement or machine is constructed to shear close to the skin to accomplish a close shave and in order to do this I provide a very thin shear plate or its equivalent, this plate resting on the skin and having an opening or openings against the edge of which a cutter operates to cut the hair. The shear plate is so thin that it would collapse or flex under inward pressure and the cutter is therefore disposed in a way to support the shear plate over its

inner surface. The preferred form is to have the cutter support the shear plate over practically its entire surface at all times.

"The device is constructed to present a shear plate for movement along the skin, which plate has slots with both ends open. This form therefore provides a plate with no defined front or back but which can be moved back and forth across the skin and can therefore rest close to the skin and the hairs that are still uncut and in the slots do not raise the device out of close contact with the skin. This allows a very close shave to be accomplished. The inside cutter that operates across these slots and transverse relative to the direction of movement of the machine cuts across the edges of the slots to sever the hair, the slots being close together to form a series of narrow teeth which are prevented from moving inwardly by the support given by the inside cutter, which cutter has its teeth arranged on the end as differentiated from prior cutting devices in which the movable cutters have the teeth operating alongside the shear plate.

"The device comprises, in its preferred form, a handle 10 on the end of which is the shaving head 11. On the end of the shaving head is the shear-plate 12 which in this instance is shown as a series of parallel blades 13 on the end of the U-shaped piece 14a. The blades 13 are formed by cutting parallel slots 14 across the end of the piece 14a. This plate 13 can be provided with openings of other shapes as will be evident but this form is thought to be the easiest and cheapest to make.

"The plate 12 is made extremely thin and when used against the skin the skin forms a cushion so that the shearing or cutting edge which is on the inside face of the plate is practically flush with the surface of the skin. The blades 13 are too close together, however, to allow the skin to pass up into the slots 14 and the skin is therefore safe from cutting. * * *

"The cutter can be of a design to co-operate with the opening or openings in the shear plate and is arranged to support the shear plate 12 from the inside. This prevents flexing and bending of the shear plate and thus provides a firm and smooth-feeling surface presented to the skin.

"The cutter in this form comprises a bar 15 which is cut away as at 16 to form teeth 17 which teeth pass across the edges of the blades 13 to shear the hair. The teeth are arranged so that a tooth passes over an opening in one direction and shears against one edge of the opening and moves far enough to uncover the other edge of the opening and shear against the latter on the return stroke. The teeth are wider than the openings and this causes the teeth to bear at all times on a major portion of the blades 13 as one tooth engages a blade before the preceding blade leaves it. * * *

"The cut-away parts 16 are deep enough to allow the hair to enter the spaces 14 and are inclined at the top to direct the cut hair to the slot 18 in the side wall of the shaving head 11 from which it falls or from it can be conducted by a flexible tube which in turn might be connected to a vacuum pump.

"The cutter reciprocates in the U-shaped member 14a and is mounted on a bar 19 which acts as a support for the cutter and which carries means such as the screws 20 and the soft metal plate 21 for adjusting the cutter when it wears. The U-shaped piece and the bar 19 can be held in place by the screws 22 between the side pieces of shaving head 11. This enables the U-shaped piece and its contents to be taken out as a unit whenever it is necessary to do so by simply removing the screws 22.

"The cutter is reciprocated and I show a shaft 23 for the purpose, one end having an eccentric stud 24 in a transverse slot in the cutter so that when the shaft rotates the cutter is moved back and forth across the blades 13. The shaft extends into the handle and can have any form of attachment for a flexible shaft such as exemplified by the recess 25."

The specifications describe, and the drawings illustrate, various ways and forms and modifications of making the cutter of the shaving implement, and then state:

"In these various modifications the ends of the teeth are flat so as to give a maximum surface bearing against the inner faces of the blades 13. The blades 13 are made of extremely hard material to form a series of keen cutting edges and when the end of the shaving head is passed over the face a close comfortable shave is accomplished.

"In shaving devices that are to be used on long hair, such as in clipping as distinguished from shaving the blade of course is made of material thickness and can support itself. The use of a relatively thin plate with a cutter operating under it

and offering the easy adjustment possible in this case is novel. The old fashioned clipper is cumbersome and forms such a broad and deep surface that it cannot be used to clip with comfort in recessed places or where obstructions are offered. The use of a flat cutter operating in conjunction with a narrow shear plate also offers advantages apparent to one familiar with the use of such implements.

"It will be understood that modifications can be made in the construction of the implement as shown without departing from the scope of the invention."

The claims of the patent with which we are immediately concerned, and which were held by the Circuit Court new and allowable over all prior art, including Appleyard's patent, are claim 1:

"1. A shaving implement comprising a shearing plate of extreme thinness to rest against the skin, having an opening for the reception of hair, a cutter to travel across the opening to provide a shear cut with one edge of the opening, and means for holding the parts to insure the supporting of the plate against flexing by means of the cutter."

and claim 13:

"13. A shaving implement comprising a shear-plate with slots extending from side to side, a cutter under the plate and having teeth to cooperate with the edges of the slots in cutting, and means for operating the cutter transversely of the slots."

The Circuit Court of Appeals decided that Schick, regardless of how much he may have taken from Appleyard, made patentable improvements which he disclosed and covered in his claims, in at least three particulars:

1. He provided a shear plate throughout of extreme thinness;

2. He provided slots extending all the way across such plate from edge to edge; and

3. He combined the cutter bar with the shear plate in such a manner that the said bar supports the plate thoughout its entire width against flexing.

Generally speaking, the Schick shaver consists of three parts or elements: The handle or case containing the electric motor equipment for actuating the shaving elements, and the two detachable, extremely thin shaving elements, consisting of an outer member or shear plate and an inner reciprocating member or cutter under the shear plate. The thin outer member is supported against flexing from inward pressure by the extent of the inner cutter, and means such as springs operative upon the base surface of the inner member which rests in the handle when the shearing elements are attached to the handle.

The devices of defendants illustrative of the dry shavers of the defendants involved in this proceeding are in the record as exhibits and are stamped "Model HH" upon the body or handle. The word "Motoshaver" is stamped upon one type, and "Dual-Head Motoshaver" is the inscription upon other types.

The change in design, in fact the only difference between the types, appears to be that in one the slots that extend horizontally entirely across each of the two shearing plates of the device are not extended far downwardly on the inner side walls toward the base of the head of the shaver, while in the other type the slots not only continue horizontally across the shearing plate, but also all the way downwardly on the inner side walls toward the base of the head. In other words, a like mode of operation is present in the cutting or shearing parts of the two types, but in one the slots extend further downwardly on the inner walls of the shear plates than in the other. This modification is immaterial in considering the patent that is under consideration in this proceeding and in no way evades infringement of such patent.

As we are primarily concerned in this proceeding with the detachable shaving or cutting means or head of defendants' structures, little need be stated or discussed at this time as to the case or handle into which the cutting means are placed or as to the actuating mechanism or motivating power of the devices. Suffice it to say that both Schick and defendants' shavers, as well as the others exhibited by defendants as adverted to earlier in this memorandum, are activated electrically, and the shearing means proper, in both Schick and defendants' shavers are held intact and taut in the handle and made operative in substantially the same way. In the commercial form of Schick and in the defendants' two types the cutter bar is spring held. This is merely a mechanical equivalent of the supporting means against inward pressure upon the thin shear plate that is specified in the patent.

With the exception of the different extent of the slots downwardly on the

inner walls as described herein, both types of defendants' shaver may be substantially described as follows:

There are two cutting members, each extremely thin and each slotted, one, the inner cutter, sliding into and under the other, the shear plate, which is prevented from moving inwardly by the support given by the inside cutter. The shear plate slots extend from edge to edge entirely across this cutting member. The machine, when operated rapidly, reciprocates the inner cutter across the keen nether ends of the shear plates and shaves the hairs which enter the slots of the shear plates as the "Motoshaver" is manually moved over the face.

This assembly of cutting members is duplicated in the Motoshaver construction; that is to say, the head or end of the device, which is manually moved over the skin in a "scrubbing" motion, has two such shearing assemblies separated from each other by a connecting and depressed area in the end of the shaving implement. This depressed part has no shearing function or shaving properties. Each of the two shear plates or outer cutters has slots extending from side to side across the top or end surface and also slots extending downwardly, and in the shaving operation the uncut hairs enter the slots and are shaved, not on a line near the comb edge of the shear plate, but simultaneously throughout the two shearing or cutting surfaces of the device to the extent of the width of the inner cutter under the skin contacting member.

The two cutting members of each shearing assembly are extremely thin throughout, as "extreme thinness" is meant in claim 1 and in the specifications of the Schick patent, and as such term is construed in the patent by the Second Circuit Court of Appeals in the following language: "Claim 1 calls for extreme thinness in the shear plate without otherwise defining more definitely the degree of thinness. But that is not fatal. The claim is to be read in connection with the disclosure of the specifications and given of permissible meanings the one which will fairly and reasonably be supported both by the language used and by the scope of the actual invention disclosed. Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721. * * * So this claim is to be read to mean thinness of shear plate sufficient to provide the desired closeness of shave and the support from flexing to whatever extent such thinness requires."

A precise microscopic measurement of the shearing teeth of the outer cutter in the defendants' types of "Motoshaver" showed the thickness of the teeth to be approximately seven thousandths of an inch throughout the length of such teeth. This denotes that each of the duplicate shear plates in defendants' shavers is of substantially uniform thinness throughout its width. There is no tapering.

The two types of defendants' shaving implements are constructed so that in operating the duplicated assemblies the teeth of the inner cutter come in contact with the nether surfaces of the teeth of the shear plate or outer cutter throughout the length of the inner cutter, and as the uncut hair enters throughout the slots which extend from side to side of the duplicated assemblies, the novel feature in claim 13, to wit, a shear plate with slots extending from side to side of the plate, which is absent in Appleyard and which the Circuit Court did not find in Packard is present in the different types of "Motoshaver" and "Dual-Head Motoshaver."

The means of the defendants' several devices, whereby the cut or shaved hair is conducted out of the machine and falls from it in shaving operations, are merely an equivalent of the means shown, disclosed, and claimed in the Schick patent.

When the "Motoshaver" and "Dual-Head Motoshaver" are compared with the disclosures and claims 1 and 13 of Schick patent, No. 1,721,530, the sole difference is that defendants have duplicate or two assemblies of cutting members mounted in a single handle, instead of one as shown in the patent.

All the elements and features of both claims are found in each type of "Motoshaver," but they are merely doubled in defendants' construction, without changing function, mode of operation, or result. This method of manufacture and production does not evade infringement. Kings County Raisin & Fruit Co. et al. v. United States Consolidated Seeded Raisin Co. (C.C.A.9) supra; Standard Caster & Wheel Co. v. Caster Socket Co. (C.C.A.6) 113 F. 162; Hawkinson v. Skogmo-Gamble (D.C. Minn.) 35 U.S.P.Q. 175.

We conclude by holding that both types of defendants' devices, that is to say, the structures labeled "Motoshaver" and the

structures labeled "Dual-Head Motoshaver" that are in evidence, have been clearly shown beyond reasonable doubt to infringe claims 1 and 13, respectively, of patent No. 1,721,530 to Jacob Schick for shaving machine, and that complainants are entitled to a preliminary injunction restraining defendants Motoshaver, Inc., a corporation, and Dalmo Manufacturing Company, a corporation, and their respective officers, agents, servants, employees, and attorneys from directly or indirectly manufacturing, selling, advertising, or offering for sale any shaving implement which embodies the invention of said patent, and in particular, either directly or indirectly manufacturing, selling, advertising, or offering for sale its shaving device known under the tradename "Dual-Head Motoshaver."

There remains to be disposed of at this time the motion of defendant Dalmo Manufacturing Company, a corporation, to quash the service of process upon it in San Francisco, California, and to dismiss it from this suit upon the ground that this District Court has no jurisdiction over it.

We think the motion should be denied.

Mention has already been made of the undisputed evidence of the joint activities and trespass of this corporation with defendant Motoshaver, Inc., in the manufacture and sale of the latter's infringing devices. There is no dispute as to this court's jurisdiction over Motoshaver, Inc. This company has a regular and established place of business within the Southern District of California, and infringing acts have been clearly pleaded and proved against it which have been committed within this district. Under such a state of facts the other California corporation that is named as a defendant, although it has no regular or established place of business or offices in this district, is nevertheless amenable to the process of this District Court and subject to its jurisdiction. Potter v. Hook Scraper Co. (D.C.N.Y.) 8 F.Supp. 66.

Section 52 of the Judicial Code, title 28 U.S.C.A. § 113, provides: "Suits in States containing more than one district. When a State contains more than one district, every suit not of a local nature, in the district court thereof, against a single defendant, inhabitant of such State, must be brought in the district where he resides; but if there are two or more defendants, residing in different districts of the State, it may be brought in either district, and a duplicate writ may be issued against the defendants, directed to the marshal of any other district in which any defendant resides. The clerk issuing the duplicate writ shall indorse thereon that it is a true copy of a writ sued out of the court of the proper district; and such original and duplicate writs, when executed and returned into the office from which they issue, shall constitute and be proceeded on as one suit; and upon any judgment or decree rendered therein, execution may be issued, directed to the marshal of any district in the same State."

This statute has been carefully considered with section 48 of the Judicial Code, 28 U.S.C.A. § 109, and in my opinion properly construed by Judge Dickinson in Zell v. Erie Bronze Co. (D.C.) 273 F. 833, 837, where he said: "The genesis of these several acts of Congress and the order in which they appear in the present Judicial Code are all consistent with this thought, that a defendant in any kind of a case may be sued in his own district, and there alone, except that where diversity of citizenship is a sole ground of jurisdiction he may also be sued, if service can there be had upon him, in the district of the plaintiff, and that in patent suits the infringer may be sued in the district in which he commits acts of infringement, if he there maintains an office, etc.; that where there are several defendants the plaintiff may proceed against the defendant who is an inhabitant of the district in which the suit is brought, and if all of the defendants reside within the same state, although in different districts, they may all be sued in the district of any one of them, extraterritorial service being made upon those out of the districts."

Since the submission of this application for preliminary injunction, our attention has been called to a ruling entered November 22, 1937, in the District Court in Connecticut in Schick Dry Shaver, Inc., et al. v. General Shaver Corporation et al., 2 F.Supp. 718.

In that action complainants, suing upon the same patents that are in suit before us, were denied a preliminary injunction. The alleged infringing device involved in that proceeding is the "Remington" shaver.

Judge Thomas expressed "serious doubt" as to whether or not, from the record before him, infringement had been shown to the necessary degree of certainty to warrant him in granting a preliminary injunction, and he therefore denied the application for such injunction.

Of course each preliminary injunction proceeding must be determined upon the concrete record under consideration. Here we have a wholly different record than the one before Judge Thomas, and we have no doubt whatever under the record here as to infringement in the instant suit.

It appears that Judge Thomas was not satisfied from the record before him that in the "Remington" shaver the shear plate, although of extreme thinness, relied upon the inner cutter for support against flexing as called for in claim 1 of the Schick patent as construed by the Circuit Court. Neither was Judge Thomas satisfied from the record before him that the shear plate of the "Remington" shaver, because of a central longitudinal bar dividing two planes of slots, has slots extending from side to side as called for in claim 13 of the Schick patent. This presents quite a different picture than we have found in the device before us.

We think that the "Remington" shaver is so unlike defendants' structures as to remove it from consideration in this suit.

This memorandum opinion is adopted as the findings of fact and conclusions of law of this court herein pursuant to Equity Rule 70½, 28 U.S.C.A. following section 723. National Reserve Insurance Co. v. Scudder (C.C.A.9) 71 F.2d 884, 888.