**SCHICK DRY SHAVER, Inc., et al. v. MOTOSHAVER, Inc., et al.**

No. 1274-M.

District Court, S. D. California, Central Division.

Nov. 12, 1938.

William Gibbs McAdoo and E. Walter Guthrie, both of Los Angeles, Cal. (Abraham Tulin and Reginald Hicks, both of New York City, of counsel), for plaintiffs.

Oscar A. Mellin, of Oakland, Cal., and Hill, Morgan & Bledsoe, by Kenneth K. Wright, of Los Angeles, Cal., for defendants.

McCORMICK, District Judge.

Upon decision of the motion for preliminary injunction, this court followed the majority opinion of the Second Circuit Court of Appeals in Schick Dry Shaver, Inc., v. Dictograph Products, 89 F.2d 643. We conceived it to be our duty, in the then state of the record, to subordinate our own opinion as to the scope of the Schick primary patent No. 1,721,530 to the decision of the appellate court, Schick Dry Shaver, Inc. v. Motoshaver, Inc., D.C., 21 F.Supp. 722; notwithstanding the sharp division of learned views in the higher tribunal on Schick's contribution to the dry shaver art and his great improvement over the only worthwhile earlier reference, to-wit, a British patent, No. 753, to Appleyard, dated March 10, 1914.

The record made in this action at the trial on the merits is different and much more comprehensive than that before the Second Circuit Court of Appeals in the Dictograph Case. It requires us most respectfully to attribute to the three Schick inventions broad claims and a liberal construction of those which have been made in the patents. Smith v. Snow, 294 U.S. 1, 14, 55 S.Ct. 279, 79 L.Ed. 721; Eibel Process Co. v. Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523; Irving-Pitt Mfg. Co. v. Blackwell-Wielandy Book & Stationery Co., 8 Cir., 238 F. 177. We think the recent decision of the Supreme Court in General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L. Ed. 1402, which considered the recondite granular composition of filaments for electric incandescent lamps, is not comparable to the art of electrically driven dry shaving machines. In the former the field is limited and therefore the variant from earlier inventions must be specifically defined in the claims in order to comply with statutory requirements. 35 U.S.C.A. § 33.

In the latter the applicable field was practically and commercially open at the time of Schick No. 1,721,530, and there was no dry shaving implement at that time employing the Schick principle of dry shaving which successfully shaved at the surface of the skin by having the skin itself cushion or enter into the openings of a relatively thin face contacting shear plate, until it practically reaches the cutting mechanism underneath so that the surface of the skin at that point is flush with such cutting mechanism.

Schick, having been the first to conceive, reduce to practice and obtain patent for machines which efficiently shaved in such manner, is entitled to enjoy the fruits of his invention, and if, in the light of these accomplishments and the wide commercial adaptations of dry shaving appliances embodying Schick's novel principle and mode of operation that have followed notwithstanding the severe economic depression, he is to be restricted to approximate copies of his new device, his patents are substantially divested of any adequate protection. Moreover, in regard to defendants' contention as to the pertinency of the ruling in General Electric Co. v. Wabash Appliance Co., supra, it should be noted that the meager description of the filament in the claims invalidated by the Supreme Court in Pacz No. 1,410,499 is in no way comparable to the terms used in the Schick claims in suit. Especially is this true regarding the broad claims 1 and 13 of the earliest Schick patent as interpreted by the Court of Appeals in the Dictograph Case.

We are also of the opinion that the primary aspects of Schick patents Nos. 1,-721,530, 1,757,978 and 1,747,031 respectively are examples of those cases in which the Supreme Court stated that reference could be made "to the descriptive part of the specification in order to give definite content to elements stated in the claim in broad or functional terms." 58 S.Ct. 903. See, also, Angelus Sanitary Can Machine Co. v. Wilson, 9 Cir., 7 F.2d 314.

The three Schick patents that are in suit, namely, No. 1,721,530 applied for March 31, 1928, and granted July 23, 1929, No. 1,757,978, for which application was filed April 23, 1928, and which was issued May 13, 1930, and No. 1,747,031, for which application was filed July 2, 1928, and which was issued February 11, 1930, are by the same person as patent applicant— J. Schick. They were co-pending, and under the factual situation that is presented by the record before us, and as determined by this court in its Findings of Fact which follow, there has been no double patenting. Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., 2 Cir., 22 F.2d 259; Gibbs v. Triumph Trap Co., 2 Cir., 26 F.2d 312; Claude Neon Lights v. E. Machlett & Son, 2 Cir., 27 F.2d 702; Southern Textile Machinery Co. v. United Hosiery Mills Corporation, 6 Cir., 33 F.2d 862; American Hatters & Furriers Co. v. Danbury & Bethel Fur Co., D.C.Conn., 47 F.2d 268.

In our decision granting preliminary injunction against the defendant Dalmo Manufacturing Company, a California corporation, as well as against its co-defendant Motoshaver, Inc., we held, under the record at that time, and in line with Zell v. Erie Bronze Co., D.C., 273 F. 833, that jurisdiction existed in this District Court over both domestic corporate defendants.

Since our decision, the Ninth Circuit Court of Appeals, in Endrezze v. Dorr Co., decided May 23, 1938, 97 F.2d 46, has held that Section 48 of the Judicial Code, 28 U.S.C.A. § 109, is solely applicable to patent infringement suits, and inasmuch as the two requirements of Section 48 are not present in this action as far as Dalmo Manufacturing Company is concerned, we are powerless to enter a decree of infringement against it. We have, however, in Findings of Fact hereinafter stated, set forth the factual situation that is shown by the record before us at this time.

We think that under the evidence defendant Dalmo Manufacturing Company is guilty of joint or contributory infringing acts with defendant Motoshaver, Inc., Trent v. Risdon Iron & Locomotive Works, 9 Cir., 102 F. 635; National Mechanical Directory Co. v. Polk, 9 Cir., 121 F. 742; Dental Co. of America v. S. S. White Dental Mfg. Co., 3 Cir., 266 F. 524, 526; but on account of insufficient proof under the Endrezze Case, supra, this District Court cannot enter a decree of injunction against Dalmo Manufacturing Company at this time.

The following Findings of Fact, Conclusions of law, and direction for the entry of judgment pursuant to Rule 52 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, and Equity Rule 70½, 28 U.S.C.A. following section 723, are

made and entered as the decision of this court on the merits.

### Findings of Fact.

1. The plaintiff, Schick Industries, Limited, is a corporation organized and existing under the laws of the Bahama Islands, and is the owner of the legal title to the patents in suit, to-wit, patent No. 1,721,530, issued to Jacob Schick July 23, 1929, on an application filed March 31, 1928; patent No. 1,757,978, issued to Jacob Schick May 13, 1930, on an application filed April 23, 1928, and patent No. 1,747,031, issued to Jacob Schick February 11, 1930, on an application filed July 2, 1928; which three patents were co-pending simultaneously in the Patent Office.

2. The plaintiff, Schick Dry Shaver, Inc., is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Stamford, Connecticut, and is the owner of the exclusive right to make, use and sell, and to grant to others sub-licenses to make, use and sell, in the United States of America, the inventions of the three patents in suit.

3. The plaintiff Edises, Inc., Schick Dry Shaver Distributors, is a corporation duly organized and existing under the laws of the state of Nevada, with its principal place of business at San Francisco, California, and has the exclusive right of distribution of the Schick Dry Shaver, which embodies and is made pursuant to the inventions of the three patents in suit, by contract in writing from and with the plaintiff Schick Dry Shaver, Inc., throughout the State of California and the other Pacific and far western states of the United States.

4. The defendant Motoshaver, Inc., is a corporation organized and existing under the laws of the state of California and has a regular and established place of business in Los Angeles, California, within the Southern District of California, Central Division, where it has advertised and sold dry shaving implements variously known as "Motoshaver" and "Dual-Head Motoshaver," exemplars of which are in evidence as plaintiffs' Exhibits 18, 23 and 24, within six years prior to the filing of the bill of complaint herein.

5. The defendant Dalmo Manufacturing Company is a corporation organized and existing under the laws of the state of California and has a regular and established place of business in San Francisco, California, within the Northern District of California, where it has manufactured for and sold to the defendant Motoshaver, Inc., dry shaving implements variously known as "Motoshaver" and "Dual-Head Motoshaver," exemplars of which are in evidence as plaintiffs' Exhibits 18, 23 and 24, within six years prior to the filing of the bill of complaint herein.

6. The defendant Dalmo Manufacturing Company through transactions with defendant Motoshaver, Inc., has built up a large and lucrative business in the manufacture and sale of said "Motoshaver" and "Dual-Head Motoshaver" dry shaving machines, and since September, 1936, in excess of 30,000 of such dry shaving devices were manufactured and sold by said defendant Dalmo Manufacturing Company. The business of defendant Dalmo Manufacturing Company with defendant Motoshaver, Inc., in manufacturing and selling such dry shaving machines during such time was widely distributed over the United States, and said defendant during such time knowingly participated in the offering for sale and in the distribution of said "Motoshaver" and "Dual-Head Motoshaver" dry shaving machines which were during such time offered for sale, sold and distributed by defendant Motoshaver, Inc., within the Southern District of California.

7. The subject of the three patents, No. 1,721,530, No. 1,757,978 and No. 1,747,031, is a mechanical dry shaver, a device by means of which the hair can be quickly, readily and efficiently removed from the face and other parts of the body without any unpleasant or disagreeable effect, and yet requiring none of the age-old instrumentalities of shaving in the way of exposed sharp-edged blades, soap, lather, creams and the like.

The invention of patent No. 1,721,530 is concerned primarily with the head of the shaver and in general includes the following elements:

(1) A shear plate, that is to say, a very thin plate or its equivalent to rest against the face with an opening or openings in it which may be such as are illustrated in the drawings of the preferred form of the device or openings of other shapes, and having walls adjoining the sides of the plate.

(2) Movable cutter means disposed inside said side walls and operating underneath such shear plate to cut the hairs

against the nether or inside edges of the opening or openings of the shear plate by a shearing action which takes place on, or practically on, the surface of the skin; and

(3) Means for supporting the shear plate against external pressure in shaving and possible inward flexing by means of the cutter to whatever extent the thinness of the shear plate may require; and also means for operating the cutter in co-operation with the cutting or inside edges of the openings of the shear plate.

The shear plate is of a thinness sufficient to provide the desired closeness of shave—the width of the openings therein being so proportioned to such thinness that when the plate is used against the skin, the skin forms a cushion or enters into said opening or openings, so that the shearing or cutting edges of said openings, which are on the inside face of the plate, are practically flush with the surface of the skin. These shearing or cutting edges are too close together to allow the skin to pass up into or beyond the slots or spaces between them on the inside face of the plate, so that while the hairs are thus cut practically at the surface of the skin, the skin itself is safe from being cut. Both this principle of shaving and the construction to effectuate it are disclosed in the specifications and illustrated in the drawings of this patent.

The means for supporting the shear plate against external pressure in shaving and preventing it from flexing inwardly thereunder by means of the inner cutter may be adjustable set screws and a soft metal plate underneath the cutter, or such equivalent means, including appropriate springs, as will give the support against flexing to whatever extent the thinness of the shear plate requires. According to the patent it is preferred, but not essential, to have the inner cutter support the shear plate over practically its entire surface at all times.

8. The foregoing general elements of patent No. 1,721,530 and several specific forms thereof are variously covered in the claims of that patent in suit, as follows:

a. Claim 1 provides for a shaving implement which is to shave by the means and in the manner described in the specifications, comprising a shear plate of a thinness sufficient to provide the desired closeness of shave to rest against the skin; an opening in such shear plate for the reception of hair; a cutter to travel across the opening to provide a shear cut with one edge thereof, and means for insuring the support of the shear plate against flexing to whatever extent its thinness requires by means of the cutter. The cutter is not required by this claim to support the shear plate over its entire inner surface, but need do so over only such part of its inner surface as will sufficiently support the shear plate against inward flexing in shaving to whatever extent its thinness may require.

b. Claim 4 provides for a shaving implement which is to shave by the means and in the manner described in the specifications, comprising substantially the same elements as are described and covered in claim 1, except that the shear plate is to be perforated, instead of merely having an opening, and is to be supported against external pressure by the inner cutter, without mention of flexing. The word "perforated" connotes that the shear plate described by this claim is to have a plurality of holes or openings. The cutter required by this claim need support the shear plate only over such part of the inner surface of the shear plate as will sufficiently support the shear plate against external pressure in shaving to whatever extent its thinness may require.

c. Claim 13 provides for a shaving implement which is to shave by the means and in the manner described in the specifications, comprising a shear plate which shall have slots extending from side to side, a cutter under the plate having teeth to co-operate with the edges of the slots in cutting, and means for operating the cutter transversely of the slots. The phrase "shear plate" in this claim does not include any supporting walls or members, even if they are so physically joined to the shear plate that their top surfaces lie in the same plane as the top surface of the shear plate and should in fact be uninterrupted continuations of such top surface. The slots provided by this claim need not be open-ended.

d. Claim 14 provides for a shaving implement which is to shave by the means and in the manner described in the specifications, comprising, in combination, a series of blades which are specified to be both thin and narrow and having outer surfaces adapted to lie against the surface of the skin while shaving, said blades being separated by slots specifically required to be wide enough to permit at least one hair to

enter, but the width of which shall be so proportioned in respect to the thin and narrow dimensions of said blades as to prevent the surface of the skin being shaved from extending above the rear surfaces of the blades when the blades contact the surface of the skin during a shaving operation; cutter means having shearing edges in contact with the rear surfaces of the blades, and means for operating said cutter means in relation to the blades.

e. Claim 15 provides for a shaving implement which is to shave by the means and in the manner described in the specifications, comprising, in combination, substantially the same specific elements as are provided in claim 14, except that the blades need not be narrow, but only closely spaced; that their rear surfaces must have edges against which hair is cut close to the surface of the skin; that the device is to be drawn over the surface of the skin in a direction substantially continuous with the edges of the blades, thus providing that said edges must all be substantially parallel with each other, and that the cutter means of the device must have teeth bearing against the rear surfaces of the blades.

f. Claim 16 provides for a shaving implement which is to shave by the means and in the manner described in the specifications, comprising, in combination, substantially the same specific elements as are provided in claim 15, except that the closely spaced blades are specified to be relatively thin and of substantially the same cross-sectional area along their shearing length; and that there are means to translate the cutter means in a direction lateral to the blades.

g. Claim 17 provides for a shaving implement which is to shave by the means and in the manner described in the specifications, comprising, in combination, substantially the same specific elements as are provided in claim 14, except that the blades of the shear plate need not be narrow and must be parallel spaced, and that the slots separating such blades must be open-ended on at least one side of the shear plate, but need not be on the other side.

h. Claim 19 provides for a shaving implement which is to shave by the means and in the manner described in the specifications, comprising, in combination, substantially the same elements as are provided in claim 13, except that the shear plate is rectangular, constitutes a relatively narrow skin contacting area, and has slots across its narrow dimension which, in addition to extending from side to side of said shear plate, as required by claim 13, are also required to be open-ended on both sides thereof.

9. Patent No. 1,757,978 was co-pending in the Patent Office together with patent No. 1,721,530, and discloses and covers certain additions and improvements to the shaving implement described in the latter patent in combination with all the other elements of the same, of which the following is involved in and pertinent to this suit, namely:

The side or supporting walls of the shear plate have openings opposite the slots of the shear plate, through which hair may enter the slots without substantial bending of the hair at the surface of the skin.

10. The foregoing improvement in a shaving implement of the kind disclosed in patent No. 1,721,530 is covered in claim 1 of patent No. 1,757,978. The specific features described and covered in claim 1 include openings in the side walls supporting the shear plate at the ends of its blades opposite the slots thereof which extend widthwise of its narrow width, and cutter means including a plate in contact with the rear surface of the shear plate having alternate slots and teeth whereby hair in the slots thereof is sheared as said cutter means is translated. The word "slots" in this claim means the spaces between the inside or nether edges of the teeth of the plate.

11. Patent No. 1,747,031 was co-pending in the Patent Office together with patents No. 1,721,530 and No. 1,757,978, and describes and covers a shaving machine of the same kind as is described and illustrated in the two latter patents with the addition of shoes or projections on the ends of the teeth or blades of the shear plate to pick up hairs that lie close to the skin and direct them into the slots as the machine is passed over the face in a direction substantially parallel with the longitudinal axis of the teeth. This shaving machine has a hollow end piece with a series of teeth on one face, the teeth having small slots between them, pointed shoes on the ends of the teeth and cutter teeth in the hollow end piece passing under the first teeth to sever hair passing through the slots, as specified in claim 1 of said patent No. 1,747,-031.

12. Plaintiff, Schick Dry Shaver, Inc., has manufactured and sold dry shavers under the name "Schick Dry Shaver" which embody the inventions of patents No. 1,721,530, No. 1,757,978 and No. 1,747,031, since 1931. Examples of the different models of the "Schick Dry Shaver" so manufactured and sold by the plaintiff Schick Dry Shaver, Inc., since 1931 are in evidence as plaintiffs' Exhibits 1, 2, 3, 4 and 5. All said models embody the inventions of each of the three patents aforesaid.

13. The "Schick Dry Shaver" was the first actual and practical dry shaver sold on the market. An attempt to evolve a dry shaver was made in the United States as early as the year 1900 by Drosse; and throughout the subsequent years numerous others attempted to produce a practical operative dry shaving machine both in the United States and elsewhere, but until Jacob Schick, the patentee, made the invention which is the subject of patent No. 1,721,530, nothing effective and commercially successful had been accomplished.

14. When the Schick Dry Shaver was first offered for sale on the market in 1931, it was a device so radically new and unheard of that the trade and public were skeptical of its utility and practicability, and were reluctant to stock or buy it. There was widespread disbelief that the device could actually shave, and sales thereof were and could be made only by personal demonstration to individuals who demanded and received money back guarantees in case they should be dissatisfied. The retail price of the Schick Dry Shaver was then $25, but was reduced to $15 in 1932. However, because of its intrinsic value, the Schick Dry Shaver came more and more to be accepted by the trade and the public as an article of merit, which is saleable and usable and gives satisfaction. It has gone into widespread use, despite sales resistance due to a high price, its radical departure from the common razor method of shaving and the severe economic depression which soon followed its appearance. Its commercial success under these adverse conditions is plainly indicated by its increasing annual sales:—In 1931 such sales amounted to 3,200 shavers; in 1932 to 10,300; in 1933 to 42,000; in 1934 to 76,000; in 1935 to 219,000; in 1936 to 723,000; and in 1937 to 770,500. Up to December 31, 1937, an aggregate of some 1,800,000 Schick Dry Shavers had been sold to the public at the prices above stated, and the gross receipts from such sales by the plaintiff Schick Dry Shaver, Inc., at wholesale totalled about $18,000,000 at a cost for advertising and sales promotion of less than 5% of such amount, or less than fifty cents per shaver sold.

15. The defendant pleaded numerous prior patents as anticipating the inventions of the patents in suit, or depriving such patents of invention. It introduced in evidence, in substantiation of these pleas, the following patents, each of which has its exhibit number in this case preceding the name of the inventor:

| Exhibit Number in this Case | Name of Patentee | | Number of Patent | Date of Issuance of Patent |
|---|---|---|---|---|
| Dft's. Ex. 14A | Andis | | 1,666,588 | Apr. 17, 1928 |
| Dft's. Ex. 14B | Andis | | 1,671,265 | May 29, 1928 |
| Dft's. Ex. 14C | Appleyard | British | 753 | Jan. 10, 1913 |
| Dft's. Ex. 14D | Bruecker | | 1,159,647 | Nov. 9, 1915 |
| Dft's. Ex. 14E | Brunacci | | 911,472 | Feb. 2, 1909 |
| Dft's. Ex. 14F | Chaney | | 512,009 | Jan. 2, 1894 |
| Dft's. Ex. 14G | Drosse | | 664,388 | Dec. 25, 1900 |
| Dft's. Ex. 14H | Fourniols | French | 613,873 | Sept. 6, 1926 |
| Dft's. Ex. 14I | Fusch | | 1,350,717 | Aug. 24, 1920 |
| Dft's. Ex. 14J | Halterman | | 1,247,828 | Nov. 27, 1917 |
| Dft's. Ex. 14K | Halterman | | 1,286,606 | Dec. 3, 1918 |
| Dft's. Ex. 14L | Hoberecht | | 1,730,889 | Oct. 8, 1929 |
| Dft's. Ex. 14M | Johns | British | 10,700 | 1909 |
| Dft's. Ex. 14N | Kawalle | | 1,543,387 | June 23, 1925 |
| Dft's. Ex. 14O | Milliken | | 558,973 | Apr. 28, 1896 |
| Dft's. Ex. 14P | Roux | | 847,609 | Mar. 19, 1907 |
| Dft's. Ex. 14R | Stearns | | 1,205,576 | Nov. 21, 1916 |
| Dft's. Ex. 14S | Werner | Swiss | 73,939 | Apr. 14, 1916 |
| Dft's. Ex. 14T | Werner | | 1,241,798 | Oct. 2, 1917 |

16. None of the prior patents introduced in evidence by the defendant in any manner anticipates either patent No. 1,721,530 or patent No. 1,757,978 or patent No. 1,747,031, nor do any of these patents qualify or in any manner affect claims 1, 4, 13, 14, 15, 16, 17 or 19 of patent No. 1,721,530, or any of them, or claim 1 of patent No. 1,757,978, or claim 1 of patent No. 1,747,031. None of the aforesaid prior patents sufficiently describe or disclose an operable dry shaving device, wherein the principle, mode of operation and results attained are equivalent to those of the three Schick patents in suit.

17. Of the patents introduced in evidence herein by the defendants as anticipating the inventions of the three patents in suit, or depriving them of invention, the eleven which are below listed were introduced in evidence in a contested suit for infringement of the first two Schick patents herein involved in the United States District Court for the Eastern District of New York in 1936, 16 F.Supp. 936, wherein the plaintiffs were Schick Dry Shaver, Inc., and Schick Industries, Limited, and the defendant was Dictograph Products Company, Inc. That suit was tried upon the merits in July, 1936, and a judgment rendered in October, 1936, decreed, among other things, that claims 1 and 13 of patent No. 1,721,530, which were the only claims thereof involved in said suit, were good and valid in law. This judgment was to that extent thereafter and in April, 1937, duly unanimously affirmed by the United States Circuit Court of Appeals for the Second Circuit, 89 F.2d 643, on an appeal taken to said court by the defendant in said suit. The record on said appeal included all said eleven prior art patents, which, together with their exhibit numbers herein, are:

All these patents, with the exception of the British patent to Appleyard, No. 753, clearly have so little in common with any of the Schick patents here in suit, as previously found by both courts in the suit in the Second Circuit above-mentioned, as to merit no further special findings herein with regard to them.

18. The British patent to Appleyard, No. 753 (defendants' Exhibit 14C), relates to a shaving or hair cutting appliance of the power driven type which has for its avowed object to construct an appliance which will cut the hair to the level or surface of the skin without injuring the latter, and that will do so without the necessity for employing soap or other preparations to facilitate the cutting or shaving operation. The means described in the patent for achieving this object comprise a fixed cutter having one or more finely serrated knife edges to produce a number of fine teeth which are spaced sufficiently closely together to admit hairs into the spaces between the adjacent teeth but to prevent the skin, or any spots, pimples or the like thereon, from entering such spaces when the teeth are moved over the surface of the skin. These fine teeth are specified in the patent to be ten one-hundredths of an inch wide and a fiftieth of an inch long, and they are tapered outwardly from seven thousandths of an inch in thickness at their base. The patent states in both specifications and claims that these teeth must have knife edges or sharp ends; which sharp ends are exposed and are to come in contact with the surface of the skin to be shaved. Underneath the fine teeth of the fixed cutter and operating in conjunction therewith is another toothed cutter which is reciprocated in an endwise direction, so that the ends of its teeth, which are likewise exposed and which the patent provides

| Exhibit Number in this Case | Name of Patentee | | Number of Patent | Date of Issuance of Patent |
|---|---|---|---|---|
| Dft's. Ex. 14B | Andis | | 1,671,265 | May 29, 1928 |
| Dft's. Ex. 14C | Appleyard | British | 753 | Jan. 10, 1913 |
| Dft's. Ex. 14E | Brunacci | | 911,472 | Feb. 2, 1909 |
| Dft's. Ex. 14G | Drosse | | 664,388 | Dec. 25, 1900 |
| Dft's. Ex. 14I | Fusch | | 1,350,717 | Aug. 24, 1920 |
| Dft's. Ex. 14J | Halterman | | 1,247,828 | Nov. 27, 1917 |
| Dft's. Ex. 14K | Halterman | | 1,286,606 | Dec. 3, 1918 |
| Dft's. Ex. 14N | Kawalle | | 1,543,387 | June 23, 1925 |
| Dft's. Ex. 14P | Roux | | 847,609 | Mar. 19, 1907 |
| Dft's. Ex. 14R | Stearns | | 1,205,576 | Nov. 21, 1916 |
| Dft's. Ex. 14T | Werner | | 1,241,798 | Oct. 2, 1917 |

likewise must *move* in contact with the surface of the skin to be shaved, cross the teeth in the fixed cutter to perform the cutting operation that is well known in hair clippers. These teeth, according to the patent, are to move and can move in contact with the surface of the skin to be shaved only at their very ends, which extend to or approximately to the sharp ends or knife edges, as they are variously called in the patent, of the teeth of the fixed cutter. To prevent the skin from being scratched by the teeth as they are moved over the surface of the skin, a fixed comb or fence is situated in advance of the finely serrated edges of the fixed cutter. Shearing or clipping of the hairs at the surface of the skin between the fine teeth of the fixed cutter without the skin itself entering the spaces between such fine teeth, as called for by this patent, can therefore obviously take place only at points along a line corresponding to the sharp ends or knife edges of the teeth of the fixed cutter, where the cutting mechanism is located as in the ordinary Gillette safety razor. Although Appleyard does in his complete specifications state "the ends of the teeth may be slightly rounded or bevelled to direct the hair between the spaces," his provisional specification, the context and principle of the patent and the informative claims of the machine invention carried by it rule out any mode of practical operation which does not include sharp knife-edged teeth.

The method of shaving and the means therefor which are described in the Appleyard patent are fundamentally and generically different from the method of shaving and the means therefor which are described in the three Schick patents in suit. The method described by Appleyard is to have the hairs of the face shaved off at the surface of the skin by a shearing action of two interacting members, without having the skin itself enter the spaces between the fine cutting teeth of the Appleyard fixed cutter. For this purpose these fine cutting teeth have to end, and the Appleyard patent repeatedly provides that they must end, in sharp knife edges having no measurable thickness at all; as illustrated in the drawings and in defendants' Exhibit 24, which was made by Appleyard himself.

On the other hand, the three Schick patents in suit provide for a method of shaving at the surface of the skin through openings in a thin shear plate which rests against the skin, throughout as much of the length or extent of such openings as are traversed by an inner movable cutter underneath them; into which openings not only the hairs, but also the skin itself should enter substantially to the level of the nether or inside surface of the shear plate, but not beyond that; thus enabling the hairs on the skin to be cut at the surface of the skin underneath the shear plate by the cooperation underneath the shear plate of an appropriate movable inner cutter with the inside or nether edges of the openings in the shear plate. To achieve this method of shaving the three Schick patents in suit provide for and describe a construction, already described in these findings, which is radically and fundamentally different from that of Appleyard in concept, form and mode of operation.

The fixed comb or fence in Appleyard is also arranged, as the patent specifies, to afford the hairs an opportunity of adjusting themselves after they have been passed over by the comb and before they are met by the cutting teeth. The only condition under which this fixed comb could save the skin from being scratched by the exposed sharp ends or knife edges of the teeth of the fixed cutter, and also by the exposed ends of the movable cutter teeth, would be if the user of the appliance were to apply it to his face with so little pressure that the skin of the face would not extend down into either the space of some twenty thousandths of an inch between the comb teeth and the exposed sharp ends of the fixed cutter teeth, or into the spaces between the fixed cutter teeth themselves, which the patent specifies may be fom six to twelve thousandths of an inch wide.

The devices described in the three Schick patents in suit can shave only if the skin does enter the openings of the shear plate to substantially the level of the inside or nether edges thereof. Pressures from eight ounces to more than one pound may be and often are used with safety in shaving with these devices, without risk of injuring the skin; the amount of the pressure used depending on the skill, temperament and handiness of the user, on the toughness and degree of pliability of his skin, and on the size of the openings in the shear plate in proportion to the thickness thereof. These pressures can be and are in fact used in order to have the skin itself enter sufficiently deeply into the openings of the shear plate so that the hairs on the skin may be shaved off at the sur-

face of the skin underneath such shear plate.

The patent to Appleyard not only does not anticipate the three patents in suit or deprive them of invention, but does not limit any of the claims of the said three patents involved in this suit.

19. The device introduced in evidence as defendants' Exhibit 28 and demonstrated in open court, while having the general outward appearance of the appliance described in the Appleyard patent, is not in fact such an appliance, because its tapered fixed cutter teeth do not end in knife edges or sharp ends, as required by said patent, but in such thicknesses as to make shaving by this device impossible without having not only the hairs, but also the skin itself, enter the spaces between said teeth down to substantially the inside of the nether edges of such teeth, as described and provided for in the three Schick patents in suit. This device allows of the entry of the skin into such spaces to the extent aforesaid without danger of injury to the skin by reason of the thicknesses of the ends of its fixed cutter teeth.

20. The device introduced in evidence as defendants' Exhibit 24, which was made by Appleyard himself, was not in fact made in accordance with the teachings of Appleyard's patent in important particulars. This device does have exposed, tapered cutting teeth ending in knife edges or sharp ends of no measurable thickness whatever, as called for by that patent, but the space between the comb or guard teeth and the sharp ends of the fixed cutter teeth is only four thousandths of an inch in width on one side of the device and only six thousandths of an inch on the other side, instead of being about twenty thousandths of an inch on both sides, as contemplated by said patent. The narrowing of said space was achieved in this device by constructing the inner walls of the comb teeth so that they are perpendicular and parallel with the straight lower side walls of the movable cutter all the way up, instead of sloping outwardly toward the top as shown in the drawings of the patent.

21. The device introduced in evidence as defendants' Exhibit 23 is a ten times enlargement of the device which is in evidence as defendants' Exhibit 28, and is not pertinent to this case because it, too, departs from the requirements of the Appleyard patent in the same respects as defendants' Exhibit 28.

22. The device introduced in evidence as defendants' Exhibit 32 and demonstrated in open court as an alleged exemplar of the construction described in Halterman patent No. 1,286,606 (defendants' Exhibit 14K) is not in fact constructed in accordance with the requirements of such patent in a material respect, namely, in that the bar in said device, referred to and illustrated in that patent as the bar 6, does not project any distance whatever below the lower edges of the guards, which are described and illustrated in that patent as the guards 5; whereas the patent requires that said bar should project below the lower edges of said guards a distance equal to the approximate diameter of a hair, which the evidence shows to be from two and one-half thousandths of an inch to four thousandths of an inch.

23. The device introduced in evidence as defendants' Exhibit 33 and demonstrated in open court as an alleged exemplar of the construction described in Halterman patent No. 1,247,828 (defendants' Exhibit 14J) is not in fact constructed in accordance with the chief distinguishing requirement of such patent in that the inner rotary blade rubs strongly against the inside of its containing tube over the whole length of such rotary blade; whereas the patent prescribes that the rotary blade may be brought into very close proximity to, but not in direct contact with, the fixed blade, and must be so adjusted as to be in close proximity to the fixed blade without touching the same at any point.

24. The French patent to Fourniols, No. 613,873 (defendants' Exhibit 14H), to the extent that its disclosure is at all definite and understandable, provides a structure in which the movable or shuttle blade contacts the razor or face contacting blade at an angle and only with the tips of its saw teeth. A device so constructed would wear out very rapidly and would generate heat in operation in proportion to the amount of friction between the tips of the saw teeth of the shuttle blade and the face contacting razor blade. The patent further provides for a construction which will have the effect of increasing the angle of intersection of the shuttle blade with the face contacting blade as the points of the teeth of the shuttle blade are worn down by such friction.

The Fourniols patent, which was issued December 1, 1926, lapsed in 1932, only six years after its issuance, for failure of the

patentee to pay the annual fee to keep it alive under the law of France, which an-. nual fee was 400 francs in the year 1932. This patent does not contain a sufficient disclosure to entitle it to any serious consideration as a prior patent in the art of dry shaving.

25. The device marked in evidence as defendants' Exhibit 22, which was originally introduced as an illustration of part of the supposed construction described in the Fourniols patent No. 613,873 (defendants' Exhibit 14H), is not made in accordance with any structure deducible from the specifications and drawings of said patent.

26. Neither of the hair clippers physically introduced in evidence herein as defendants' Exhibits 1 and 2 in any way anticipates or qualifies any of the claims here relied on of any of the three patents in suit.

27. It is not true that there was no suitable motor available on the market prior to the invention of patent No. 1,721,530 for use in a dry shaver, and that the failure of all attempts before Schick's to evolve and successfully produce and market such a shaver was due to the lack of such a motor. Various types of motors of substantially the same size, power and effectiveness as the motors now generally used in dry shavers, including the Schick Dry Shaver and the devices of the defendants, were known, manufactured and used in electrically operated toys and small hand instruments which were on the market as far back as 1898, and could readily have been obtained at reasonable cost for use in dry shavers. The patent to Stout, No. 338,622, issued on March 23, 1886 (plaintiffs' Exhibit 36), shows a motor of the make-and-break type for use in toys and small electrical devices which is the same in principle and mode of operation as the motors now in use in the Schick Dry Shaver and in the defendants' devices. The size of the motor shown in that patent could readily have been adjusted to suit the power requirements of these dry shavers as early as the year 1900 by anyone familiar with the construction and electric circuit of this kind of a motor.

28. The invention of patent No. 1,721,530 is new, novel and useful and gave rise to a new art and a new industry, namely, the art of dry shaving and the industry of manufacturing and selling dry shavers. Said patent is of a generic or basic character.

29. The invention of patent No. 1,757,978 constitutes new and useful improvements on the invention disclosed and described in patent No. 1,721,530, and the device described in said patent No. 1,757,978 is new, novel and useful. The claims of this patent are not the same as those of patent No. 1,721,530, and there is therefore no double patenting or unlawful extension of monopoly.

30. The invention of patent No. 1,747,031 constitutes a new and useful improvement on the inventions disclosed and described in patents No. 1,721,530 and No. 1,757,978; and the device described in said patent No. 1,747,031 is new, novel and useful. The claims of this patent are not the same as those of either of the other two patents, and there is therefore no double patenting or unlawful extension of monopoly.

31. When the great utility and commercial success of the Schick Dry Shaver had been fully demonstrated by the pioneering efforts of the plaintiffs, competing dry shavers began to appear, including the device or devices complained of herein. The first form of this device first appeared on the market late in September, 1936, under the name "Motorshaver." An exemplar of this first form of device is in evidence as plaintiffs' Exhibit 24.

A year later, and in about September, 1937, the defendants changed both the form and name of this device, thenceforth naming such device "Dual-Head Motoshaver." An exemplar of this Dual-Head Motoshaver is in evidence as plaintiffs' Exhibit 18. Very shortly thereafter the defendants slightly modified this first form of "Dual-Head Motoshaver." An exemplar of this slightly modified device is in evidence as plaintiffs' Exhibit 23.

32. The two types of device which are exemplified herein by plaintiffs' Exhibits 18 and 23 were involved in the preliminary injunction motion herein, the original "Motoshaver," exemplified by plaintiffs' Exhibit 24, having been discontinued before such motion was made. Said two types may be substantially described as follows:

There are two cutting members in each type, one, the shear plate, which is extremely thin (within the meaning of these findings), and the other, an inner cutter, sliding underneath the shear plate. Both these cutting members are slotted. The shear plate is prevented from moving inwardly by the support given by the inside cutter,

which is pressed upwards against the nether surface of the shear plate by springs. The shear plate slots extend from edge to edge entirely across this cutting member and are, in addition, open-ended at both ends. The machine, when operated rapidly, reciprocates the inner cutter across the keen nether edges of the shear plate slots and shaves the hairs which enter the slots of the shear plate substantially at the surface of the skin as the device is manually moved over the face, the skin cushioning or entering into the openings of the shear plate down to, but not beyond, the slots at the bottom of such openings,—that is to say, down to but not beyond the keen nether edges of the blades of the shear plate.

This assembly of cutting members is duplicated in the construction of each of these two types of device; that is to say, the head or end of each of the devices which is manually moved over the skin in a "scrubbing" motion has two such shearing assemblies separated from each other by a connecting and depressed area in the end of the shaving implement. This depressed part has no shearing function or shaving properties. The slots of the shear plates or outer cutters extend downwardly into the supporting side walls thereof, and in the shaving operation the uncut hairs enter the slots and are shaved not merely on a line but simultaneously throughout the two shearing or cutting surfaces of the device to the extent of the width of the inner cutter under the skin contacting member.

The only difference between the two types of device above described is that in one, namely, the type exemplified by plaintiffs' Exhibit 18, the slots not only continue horizontally across the shearing plate but also all the way downwardly in both the outer and inner side walls toward the base of the head, while in the other type, exemplified by plaintiffs' Exhibit 23, the slots that extend horizontally entirely across each of the two shearing plates of the device are not extended far downwardly in the inner side walls toward the base of the head of the device. In other words, a like mode of operation is present in the cutting or shearing parts of the two types, but in one the slots extend further downwardly in the inner walls supporting the shear plates than in the other. This modification is immaterial and in no way evades infringement of any of the patents in suit.

Each of the two shear plates or outer cutters of both devices likewise has the outside supporting wall thereof bend inwardly immediately underneath the shear plate, with the result that the blades or teeth of the shear plate are thus made to project outwardly so as to form shoes on the ends thereof to pick up hairs that lie close to the skin and direct them into the slots as the machine is passed over the face in a direction substantially parallel with the longitudinal axis of such teeth. These teeth or blades are of substantially the same cross-sectional area or thinness throughout their shearing length.

33. The device complained of which is exemplified by plaintiffs' Exhibit 24 has two shear plates, one on either side of the shearing head, each of which is only slightly narrower and is actually thinner than the corresponding shear plates in the devices exemplified by plaintiffs' Exhibits 18 and 23. The blades of each of these shear plates are thirty thousandths of an inch in length and some five or six thousandths of an inch in thickness at their heel, with an outward taper of approximately a thousandth of an inch from heel to the ends of their shearing lengths, which taper is inconsequential. The openings or slots between the shear plate blades extend from side to side of each of the shear plates and are twelve thousandths of an inch in width. They are so proportioned in relation to the thickness of the shear plates as to allow the skin to enter into them down to their nether or inside shearing edges, but not beyond. Underneath the shear plates of this device there are reciprocating inner cutters of the same general shape and form, and which operate in the same way as the inner cutters of the devices exemplified by plaintiffs' Exhibits 18 and 23, and there are means for reciprocating these inner cutters, as in those devices. The teeth of these inner cutters are about twenty-five thousandths of an inch in length, and their surfaces contact the nether surfaces of the blades of the shear plates throughout the length of such teeth. The inner cutters are pressed upwards against the nether or inside surfaces of the shear plates by springs, just as in the devices exemplified by plaintiffs' Exhibits 18 and 23.

The two shearing assemblies in the head or end of this device are separated from and connected with each other not by a

depressed area, as in the devices exemplified by plaintiffs' Exhibits 18 and 23, but by a slightly convex area which, however, has no shearing function or shaving properties. There are consequently no inner side walls joining up with the blades of the two shear plates, and the slots of the shear plates, while extending from side to side, are open-ended on only one side thereof.

34. All three models of the device or devices, exemplars of which are in evidence as plaintiffs' Exhibits 18, 23 and 24, infringe claims 1, 4, 13, 14, 15, 16 and 17 of Schick patent No. 1,721,530.

35. The two models of the device which are exemplified by plaintiffs' Exhibits 18 and 23 embody and comprise, in combination, all the elements described and covered in claim 19 of Schick patent No. 1,721,530, and infringe such claim.

36. The two models of the device which are exemplified by plaintiffs' Exhibits 18 and 23 infringe claim 1 of Schick patent No. 1,757,978.

37. The two models of the device which are exemplified by plaintiffs' Exhibits 18 and 23 infringe claim 1 of Schick patent No. 1,747,031.

38. The shaving tests which the witness Mackeown testified that he had made on the fur of the dried hide of an animal stretched taut on a flat wooden board to which such hide was tightly nailed over a pad of possibly a half-inch of sponge rubber, and the conclusions which the witness testified that he had drawn from such tests, are of no value· herein because of the essentially different conditions which are encountered in the shaving of hairs growing on the skin of the living human face with its highly irregular contours and irregular bony structure underneath.

39. The defendant Dalmo Manufacturing Company has at no time involved in this action had a regular and established place of business within the Southern District of California.

#### Conclusions of Law.

1. This court has jurisdiction of the plaintiffs and the defendant Motoshaver, Inc., and of the causes of action.

2. The plaintiffs have good title to maintain the suit.

3. United States patent No. 1,721,530, issued to Jacob Schick July 23, 1929, is good and valid in law, particularly as to

claims 1, 4, 13, 14, 15, 16, 17, 19 and 21 thereof, and is of a generic or basic character.

4. Claims 1, 4, 13, 14, 15, 16 and 17 of Schick patent No. 1,721,530, have been infringed by the manufacture, use and sale of the dry shaving implements exemplars of which are in evidence respectively as plaintiffs' Exhibits 18 and 23.

5. Claims 1, 4, 13, 14, 15, 16 and 17 of Schick patent No. 1,721,530 have been infringed by the manufacture, use and sale of the "Motoshaver," an exemplar of which is in evidence as plaintiffs' Exhibit 24.

6. United States patent No. 1,757,978, issued to Jacob Schick May 13, 1930, is good and valid in law, particularly as to claim 1 thereof.

7. Claim 1 of Schick patent No. 1,-757,978 has been infringed by the manufacture,· use and sale of the dry shaving implements exemplars of which are in evidence as plaintiffs' Exhibits 18 and 23.

8. United States patent No. 1,747,031, issued to Jacob Schick February 11, 1930, is good and valid in law, particularly as to claim 1 thereof.

9. Claim 1 of Schick patent No. 1,-747,031 has been infringed by the manufacture, use and sale of the dry shaving implements exemplars of which are in evidence as plaintiffs' Exhibits 18 and 23.

10. Plaintiffs are entitled to a permanent injunction against the defendant Motoshaver, Inc., enjoining it against the said infringements, and to an accounting of profits and damages, and to recover the costs of this suit. It is so ordered.

11. Under the decision of the Ninth Circuit Court of Appeals in Endrezze v. Dorr Co., decided May 23, 1938, and reported in 97 F.2d 46, this court has no jurisdiction of the defendant Dalmo Manufacturing Company.

12. Plaintiffs are not, under the aforesaid decision in Endrezze v. Dorr Co., entitled to a permanent injunction against Dalmo Manufacturing Company in this court or to an accounting of profits and damages herein. Said defendant Dalmo Manufacturing Company, a corporation, is entitled to have this action dismissed against it, solely on the ground of lack of jurisdiction under Section 109, Title 28 U.S.C.A., with its sole costs against plaintiffs. It is so ordered.